**Electronically Filed
Supreme Court
SCWC-11-0000556
14-DEC-2015
08:17 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

DAVID PANOKE, Petitioner/Claimant-Appellant,

vs.

REEF DEVELOPMENT OF HAWAII, INC.,
Respondent/Employer-Appellee, and SEABRIGHT
INSURANCE COMPANY, Respondent/Insurance Carrier-Appellee.

SCWC-11-0000556

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0000556; CASE NO. AB 2005-243 (2-04-07185))

DECEMBER 14, 2015

RECKTENWALD, C.J., McKENNA, POLLACK, AND WILSON, JJ.,
WITH NAKAYAMA, J., DISSENTING

OPINION OF THE COURT BY RECKTENWALD, C.J.

David Panoke was injured while he was working for his

former employer, Reef Development of Hawaii, Inc.  This appeal

concerns Panoke's subsequent workers' compensation claim made

against Reef and its insurance carrier, Seabright Insurance Company.

Panoke was involved in a work accident in which he initially stated that he had injured his back.  Reef and Seabright accepted responsibility for Panoke's back injury. Shortly thereafter, Panoke also began experiencing pain in both shoulders.  MRIs of Panoke's shoulders showed that Panoke had labral tears and rotator cuff tendon tears in both shoulders. Reef and Seabright denied liability for Panoke's shoulder injuries.

Panoke argues that pursuant to Hawaiʻi Revised Statutes (HRS) § 386-85,[1] the Labor and Industrial Relations Appeals Board (LIRAB) was required to presume that Panoke's shoulder injuries were work-related in the absence of substantial evidence to the contrary.  The LIRAB concluded that Reef and Seabright adduced substantial evidence that rebutted the presumption that Panoke's

---

[1]     HRS § 386-85 (1993) provides:

> In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:
>
> (1) That the claim is for a covered work injury;
> (2) That sufficient notice of such injury has been given;
> (3) That the injury was not caused by the intoxication of the injured employee; and
> (4) That the injury was not caused by the wilful intention of the injured employee to injure oneself or another.

shoulder injuries were covered work-related injuries. The LIRAB also limited Panoke's Temporary Total Disability (TTD) benefits based on deficiencies in the certificates of disability submitted by Panoke's attending physicians. The ICA affirmed the LIRAB's decision and order.

For the reasons set forth below, we hold that the LIRAB erred in concluding that Reef and Seabright adduced substantial evidence that rebutted the presumption that Panoke's shoulder injuries were related to his work accident. We also hold that the LIRAB erred in relying on the deficiencies in Panoke's physicians' reports in limiting his TTD benefits. We therefore vacate the ICA's judgment and the LIRAB's decision and order and remand the case to the LIRAB for further proceedings consistent with this opinion.

## I.  Background

### A.  Panoke's June 17, 2004 Work Accident

Panoke began working for Reef as an ironworker on February 19, 2004. His job involved heavy manual labor, including welding, climbing scaffolding, carrying heavy equipment, pulling forty to fifty pound buckets up to the scaffolding using ropes, using jackhammers, and using pulleys, which involved pulling down on chain or rope with his arms to lift heavy objects. Panoke was able to perform his job duties

without any physical restrictions or symptoms from February 19, 2004 until June 17, 2004.

On June 17, 2004, Panoke was working for Reef at a construction site. Panoke's work involved installing concrete wall panels on a building. The crew used a pulley mechanism to lift the heavy panels. While the crew members were guiding one of the panels into place, the panel slipped downwards in the chain that was holding it. As the panel slipped, Panoke was guiding it with his hands underneath it, with his knees slightly bent. The panel fell around two feet and stopped short of the ground, but Panoke's body was jerked forward slightly while he held onto the panel, and then he let go and moved back to prevent the panel from landing on his toes. Panoke later recalled that he immediately felt a sharp pain in his right lower back, but felt no pain in his shoulders at the time.

**B.   Panoke's Subsequent Medical Treatment and Workers'
       Compensation Claims**

Immediately after the June 17, 2004 work accident, Panoke was taken to Concentra Medical Center (Concentra). At Concentra, Dr. Diaz-Ordaz diagnosed Panoke with a lower back strain and placed Panoke off work duty for the rest of the day, informing Panoke that he could return to work the next day with modified duties. On June 18, 2004, Reef completed a WC-1

"Employer's Report of Industrial Injury" form, and did not contest that the back strain had occurred at work or that it was covered by workers' compensation.  Panoke returned to Concentra on June 21, 2004, and June 28, 2004, and was informed on both occasions that he could return to work with modified duties.  However, Panoke did not return to work because he felt he could not handle even light duties, and instead, on June 30, 2004, he visited a new doctor, Dr. Scott McCaffrey, at Work Star Occupational Health Systems.

In his first visit to Work Star, Panoke complained of pain in his upper left back, right buttock, and right knee.  Dr. McCaffrey diagnosed Panoke with a lumbar strain or sprain, and right leg sciatica, and placed Panoke "off duty" but did not specify a date when Panoke could return to work.  Panoke next visited Work Star on July 2, 2004, when he complained of pain in his upper left back, lower back, and right hip.  Dr. McCaffrey again recorded Panoke's work status as "off duty."  Panoke returned to Work Star on July 6, 2004, complaining of upper and lower back and right buttock pain, and was also diagnosed with a left shoulder sprain.  On July 13, 2004, Panoke complained to Dr. McCaffrey of pain in his neck, mid back, right buttock, and right hamstring.  Again, Dr. McCaffrey placed Panoke "off duty."

On July 16, 2004, in addition to back pain, Panoke

complained to Dr. McCaffrey of pain in his left shoulder.  On July 30, 2004, Panoke began to complain of pain in both shoulders.  Panoke continued regular visits to Work Star from July 2004 until July 2007 with various pain complaints, including pain in his legs, feet, hips, back, and shoulders.

On August 31, 2004, Panoke saw Dr. Gary Okamura, an orthopedic surgeon, for the pain in his shoulders.  Dr. Okamura noted that Panoke had previously fractured both of his shoulders in 1991, but did not have surgery at that time.  Panoke told Dr. Okamura that he had not noticed the shoulder pain until a few days after the work accident because his back had been so sore.  Dr. Okamura stated that his initial impression was that Panoke had tendinitis and labral tears in both shoulders, but requested permission to obtain an MRI on both Panoke's shoulders.

On September 8, 2004, Reef and Seabright sought a second opinion on Panoke's condition from Deborah Agles, M.D.  Dr. Agles examined Panoke and his medical records, and noted that Panoke had been involved in a motor vehicle accident in 1991 that resulted in fractures to both of his shoulders and hospitalization for one week.  Dr. Agles opined that Panoke's current shoulder injuries had not been caused by the June 17, 2004 work accident due to the lack of close temporal proximity between the shoulder pain and the accident, Panoke's inability to

account for the development of the shoulder symptoms, and Panoke's history of prior shoulder injuries. Seabright then informed Dr. McCaffrey, the State Disability Compensation Division (DCD), and Panoke's attorney that Reef and Seabright were controverting Panoke's bilateral shoulder injury diagnoses.

On November 6, 2004, Reef and Seabright denied Dr. McCaffrey's request for the shoulder MRIs based on Dr. Agles's report. Panoke then requested a DCD hearing to review the denial. On February 15, 2005, Seabright obtained another medical opinion regarding Panoke's shoulders from Clifford Lau, M.D., an orthopedic surgeon. Dr. Lau agreed with Dr. Agles that Panoke's shoulder injuries were not a result of his June 17, 2004 work accident. Dr. Lau also opined that Panoke's ongoing back pain was more likely a result of psychological factors than the June 17, 2004 accident. Based on Dr. Lau's report, Reef and Seabright terminated Panoke's TTD benefits effective April 6, 2005. Panoke then amended his request for a DCD hearing to include review of Reef's termination of TTD.

On June 13, 2005, the DCD Director determined that Panoke's shoulder injuries were a result of the June 17, 2004 accident, and that "[Reef] ha[d] not provided sufficient evidence to support its denial of a shoulder injury." The Director therefore ordered Reef to pay for medical care, services, and

supplies for Panoke's injuries, including both shoulder injuries. The Director also ordered Reef to pay TTD compensation for the periods of June 20, 2004 through June 22, 2004 and June 30, 2004 through April 5, 2005. Reef and Seabright filed a notice of appeal to the LIRAB, and a motion to stay the payments ordered by the Director. The LIRAB denied Reef and Seabright's motion to stay on August 5, 2005.

Panoke underwent Dr. Okamura's recommended shoulder MRIs, and Dr. Okamura diagnosed him with labral tears and rotator cuff tendon tears in both shoulders, and requested permission to perform surgery. Reef and Seabright authorized the shoulder surgery, but reserved their right to seek reimbursement for any medical expenses paid in the event that the LIRAB overturned the Director's order. Dr. Okamura performed surgery to repair the rotator cuff and superior labral on Panoke's right shoulder on February 3, 2006.

Between March and June 2006, the parties disputed whether TTD was due to be paid to Panoke. Panoke argued that "[t]here can be no dispute that [Panoke] has been disabled following his surgery, however, [Seabright] has failed to pay TTD." Reef and Seabright, however, argued that they "ha[d] not received certificates of disability from [Panoke's] treating physicians." As a result of this dispute, on June 7, 2006,

-8-

Panoke moved for temporary remand to the DCD to request the Director to compel Reef and Seabright to pay TTD and assess penalties against them.  On June 26, 2006, the LIRAB temporarily remanded the case to the DCD.

Reef and Seabright argued to the Director that the disputed period of TTD payments dated from April 6, 2005 (the day after the last day of TTD ordered by the Director on June 13, 2005) through February 2, 2006 (the day before Panoke's right shoulder surgery).  Reef and Seabright stated that they had paid TTD for the period dating from February 3, 2006 to September 15, 2006, while Panoke was recovering from surgery, and for the periods previously ordered by the Director.  Reef and Seabright claimed that their denial of TTD payments for the disputed period was justified, first because of Dr. Lau's opinions that Panoke's shoulder injuries were not caused by the June 17, 2004 accident and that Panoke could return to light work, and, second, because Dr. McCaffrey had not submitted any valid certifications of disability.

On October 13, 2006, the Director issued a decision. The Director credited Dr. McCaffrey's reports, and ordered Reef and Seabright to pay TTD benefits for the period of April 6, 2005 through September 19, 2006.  The Director also ordered Reef and Seabright to pay additional TTD payments upon the receipt of

-9-

future medical certifications.  However, the Director declined to impose penalties against Reef and Seabright for late TTD payments.  Reef and Seabright appealed the Director's decision to the LIRAB, and filed a motion to stay payments.  On December 8, 2006, the motion to stay payments was denied.  Panoke underwent surgery on his left shoulder on October 20, 2007.

**C.   Appeal to the LIRAB**

The LIRAB trial was held on April 9, 2010.  The issues relevant to this appeal that were to be determined at the trial were:

> a.  Whether Claimant sustained bilateral shoulder injuries on June 17, 2004, arising out of and in the course of employment.
> . . .
> c.  What is the period of temporary total disability resulting from the work injury of June 17, 2004.
>
> d.  Whether Employer is liable for a penalty for late payment of temporary total disability benefits for the period April 6, 2005 to February 2, 2006.

Two witnesses testified at the trial, Dr. Peter Diamond and Panoke.  After Dr. Diamond was qualified as an expert in the area of orthopedic surgery, he testified to the following.  Dr. Diamond determined that the injuries to both of Panoke's shoulders were the result of degenerative, long-term conditions, including arthritis.  The arthritis may have been caused by a previous trauma injury, such as a fracture.  Dr. Diamond also determined that the labral and rotator cuff tears in Panoke's

-10-

shoulders were most likely not the result of the June 17, 2004 work accident.

Dr. Diamond gave several reasons for his opinion that the tears were not caused by the June 17, 2004 work accident. First, the mechanism of Panoke's injury that caused his back injury was not consistent with the shoulder injuries. Usually, tears in the shoulder like Panoke's are caused by a compression injury of the shoulder joints, rather than a pulling (traction) injury, which is what occurred in Panoke's case. According to Dr. Diamond, it is possible to cause tearing of the labrum or rotator cuff through a traction injury, but this would usually also cause damage to the biceps, which Panoke lacked. Second, it is very unlikely that someone would have a sudden tear of the labrum and not have any pain symptoms immediately. Dr. Diamond also opined that it is unlikely that Panoke's back pain would have masked his shoulder pain, particularly when Panoke complained of pain in his knee immediately following his back injury.

On cross-examination, Dr. Diamond was questioned as to whether Panoke's general job duties as an ironworker, such as pulling up objects by rope, or pulling down on a rope or chain, could have resulted in Panoke's degenerative shoulder conditions. Dr. Diamond answered that although heavy labor such as Panoke's

might increase the risk of arthritis, it is uncommon for heavy work to cause degenerative shoulder problems. Dr. Diamond also testified that a patient with preexisting labrum tears would be more susceptible to traction injuries resulting in labrum tears. When asked if it was possible that Panoke's June 17, 2004 work accident had aggravated Panoke's arthritic condition or the labral tearing "even to the slightest degree," Dr. Diamond responded that it was possible, but later testified that he did not think it was probable. Dr. Diamond testified that he estimated a twelve- to eighteen-month recovery time from Panoke's shoulder surgery.

Panoke testified to the following. When the concrete panel Panoke was helping to move slipped, he let go of the panel to move away after straining against the weight for a few seconds, and his body was jerked forward. He experienced an immediate, sharp, and excruciating pain in his back, but he did not have any shoulder pain. Panoke's shoulder pain started "maybe a week, a week and a half, maybe two weeks later [than the accident]." At first it was not intense, but the pain got worse over time, and Panoke still experienced significant pain at the time of the LIRAB trial. Following his second shoulder surgery, Panoke's TTD checks had stopped coming, and he was living on the beach because he had no other place to go.

On cross-examination, Panoke testified that after his second shoulder surgery, Dr. McCaffrey told him he could return to work with modified light duty, but that Reef did not have any light duty work at that time. Panoke did not look for work outside of Reef. Panoke also testified that in 1990 or 1991, he broke both of his shoulders after he fell from a moped and landed with both arms.

In their post-hearing brief, Reef and Seabright relied on the reports of Drs. Agles and Lau, and the trial testimony of Dr. Diamond, to support their argument that Panoke's shoulder injuries were not caused by the June 17, 2004 work accident.

Reef and Seabright further argued that Panoke was not entitled to TTD benefits beyond December 17, 2005, based on Dr. Diamond's opinion that Panoke's back injury had achieved maximum medical improvement eighteen months after the June 17, 2004 accident.

Panoke argued in his post-hearing memorandum that his shoulder injuries were caused by the June 17, 2004 work accident. Panoke argued that this was established because he was able to perform his work duties before June 17, 2004 without problem, there were no intervening incidents between June 17, 2004, and the onset of his shoulder pain, his previous shoulder injuries had resolved, and his attending physicians concluded that his

shoulder injuries were work-related.

Panoke also argued that the reports of Drs. Agles and Lau could not be relied upon because Dr. Agles had not examined Panoke's shoulders, and because neither Dr. Agles nor Dr. Lau considered whether the June 17, 2004 accident could have exacerbated Panoke's pre-existing condition.  Panoke further argued that Dr. Diamond's reports were flawed because Dr. Diamond failed to consider whether the June 17, 2004 accident exacerbated Panoke's shoulder injuries, and because Dr. Diamond's testimony, that the type of tears Panoke suffered to his shoulders "usually" involve compression mechanisms or bicep injuries, was irrelevant.

Panoke next argued that he was entitled to continuing TTD benefits from June 21, 2004 through July 12, 2007.  Panoke relied on the Work Star reports for this period placing Panoke off work.

Finally, Panoke argued that Reef and Seabright should have been required to pay a twenty percent penalty for late payments of TTD under HRS § 386-92.

On June 14, 2011, the LIRAB issued its decision.  The LIRAB made the following findings of fact (FOF) relevant to this appeal:

> 7.  On July 2, 2004, Claimant sought treatment with Todd M. Uchima, [physician assistant] for Dr. McCaffrey and/or Dr. McCaffrey with complaints of pain

in his upper back, lower back, and right hip.

Claimaint's Pain diagram noted that he experienced burning pain in his posterior right shoulder, aching in his left scapular region, and low back burning and stabbing pain, and pins and needles in his right hip. Claimant rated his pain at 10/10. The [LIRAB] notes, however, that two other pain diagrams of the same date do not indicate any right shoulder symptoms.

. . .

10. On July 16, 2004, Claimant sought treatment with Dr. McCaffrey with complaints of pain in his low back and left shoulder. According to Claimant's July 16, 2004 pain diagram, he had pain in his right and left shoulder, his right hip, and his right leg.

. . .

18. On August 31, 2004, Claimant informed Gary Y. Okamura, M.D. that he first noticed shoulder pain a few days after the subject accident, because his back was so sore. Claimant rated the pain on his right shoulder at 6/10 and on the left shoulder at 4/10.

. . .

20. At Employer's request, Deborah A. Agles, M.D. examined Claimant on September 8, 2004. Claimant's pain drawing noted right shoulder aching. Claimant informed Dr. Agles that his right shoulder began hurting about one week after the June 17, 2004 work accident. He was unable to describe how the shoulder was injured, but assumed it was due to the heavy lifting. Claimant had no complaints regarding the left shoulder. Dr. Agles did not, however, examine Claimant's shoulders.

. . .

29. By letter dated January 31, 2005, Dr. McCaffrey opined that Claimant sustained a "[b]ilateral shoulder sprain with chronic persistent dysfunction, right greater than left." Dr. McCaffrey noted that Claimant had no history of ongoing shoulder problems or medical treatment for the shoulders, and that Claimant "fully and totally" recovered from the prior motor vehicle accident-related shoulder trauma, without residual symptoms or impairment. Dr. McCaffrey further noted that Claimant had been involved in heavy work activities and recreational pursuits and was clinically asymptomatic before the subject work accident.

. . .

31. Clifford K.H. Lau, M.D. examined Claimant at Employer's request. In his report dated February 15, 2005, Dr. Lau noted Claimant's report that he developed pain in the front of his right

-15-

shoulder and the back of his left shoulder about a week after the subject accident. Claimant also informed Dr. Lau that he had no problems with his moped accident-related shoulder injuries after they healed.

Dr. Lau opined that Claimant's subject complaints exceeded his objective findings and that his examination showed "multiple inconsistencies."

Dr. Lau opined that Claimant suffered a strain to his lower back as a result of the June 17, 2004 work injury and that Claimant's current problems were not related to that work injury. He further opined that, based on the "time sequence and development of the shoulder complaints," Claimant's shoulder complaints were not related to the subject work accident. Dr. Lau explained that "development of neck pain and severe shoulder pain at 3-4 weeks following an injury is not medically probable unless there was loss of consciousness or change to his mental status." . . .

43. A September 21, 2005 MR arthogram [sic] ("MRA") of [Panoke's] left shoulder revealed:

> 1. . . . evidence of degenerative joint disease.
>
> 2. Moderate degenerative joint disease of the AC joint . . . .
>
> 3. High grade partial tear of the supraspinatus tendon . . . . There is also a tear involving the . . . infraspinatus tendon.
>
> 4. Stellate tear and degeneration of the superior labrum which extends into the posterior labrum. The anterior labrum is grossly normal.

44. A September 21, 2005 MRA of [Panoke's] right shoulder revealed:

> 1. Degenerative changes of the glenohumeral joint and AC joint. . . .
>
> 2. Partial tear along the articular surface of the supraspinatus tendon near its insertion site.
>
> 3. Superior labral tear near its base. The superior labrum is of increased intensity related to degeneration. . . .

-16-

45.    By letter dated September 30, 2005, Dr. Okamura reported his impressions as:

> 1.    Right shoulder superior labral tear
>
> 2.    Right shoulder partial rotator cuff tendon tear.
>
> 3.    Left shoulder superior labral tear.
>
> 4.    Left shoulder partial versus full thickness rotator cuff tear.

. . .

47.    Dr. Lau prepared a supplemental report dated October 28, 2005.  He acknowledged that Claimant had a "pain problem."  He continued to opine, however, that Claimant's shoulder conditions were not related to the June 17, 2004 work injury.  If the work accident caused the rotator cuff and labral tears to both shoulders, the significant force would have been applied to both shoulders, and "the pain would have been substantial and presentation would have occurred immediately or at least within several days to a week."

48.    Dr. Agles prepared a supplemental report dated November 15, 2005.
. . . .
[Dr. Agles] continued to opine that Claimant's shoulder symptoms were not related to the subject accident, given the lack of temporal association and Claimant's inability to describe how the shoulders were injured.  Dr. Agles noted Claimant's pre-existing shoulder pathology wherein Claimant had bilateral fractures and a left shoulder strain that was sustained while resisting arrest.
. . .

50.    On December 9, 2005, Claimant sought treatment with Dr. Baloy with complaints of pain in both shoulders, his lower back, buttocks, right upper leg, and right foot.  Dr. Baloy noted Claimant's "work status" as "off duty."

51.    On December 30, 2005, Claimant sought treatment with Dr. Baloy with complaints of pain in both shoulders, his lower back, buttocks, right leg, and right foot.
. . .

53.    On January 26, 2006, Claimant sought treatment with Dr. McCaffrey with complaints of pain in both shoulders, his mid to low back, right buttock, and right posterior thigh.  Dr. McCaffrey noted Claimant's "work status" as "off duty."

. . .

57.    On March 9, 2006 and April 11, 2006, Claimant sought treatment with Dr. McCaffrey with complaints of pain in both shoulders, his lower back, buttocks, and right leg.

58.    On April 11, 2006 . . . Dr. McCaffrey noted that Claimant was not able to work light duty, pending a left shoulder surgery.  He anticipated a return to work six months after left shoulder surgery.
. . .

62.    On May 2, 2006, Claimant sought treatment with Dr. McCaffrey with complaints of pain in both shoulders, his low back, and right leg.
. . .

67. . . .  Dr. Diamond opined that Claimant's shoulder complaints were not directly related to the subject accident because:

- There is a definite history of prior significant trauma to the shoulder, with a history of bilateral fracture.

- [Claimant] has documentation in the records of prior shoulder complaints.

- [Claimant] also has remarkably symmetrical complaints, and I suspect, findings.

- [Claimant] demonstrates multiple positive Waddell's findings,[2] tending to de-emphasize the importance of non-documented history and question the relationship of clinical findings to pain generators.

Dr. Diamond also explained that "the mechanism of injury is not typical of the shoulder pathology found."  He explained that although it is debatable,

"SLAP lesions[3] usually involve a compression mechanism, such as seen in overhead throwing, rather than a traction mechanism.  In the rare cases where traction mechanism is implicated, SLAP lessions usually involve a biceps

---

[2]    Waddell findings are exaggerated responses to pain, not necessarily intentionally exaggerated, but which do not make sense in terms of the patient's anatomical condition.

[3]    In his testimony at the LIRAB trial, Dr. Diamond explained that "SLAP" stands for "severe labrum from anterior to posterior."

-18-

avulsion, as well as other pathology."

Dr. Diamond noted that Dr. Okamura found that Claimant's biceps tendon was normal and that the operative note documented "extensive debridement due to glenohumeral joint arthritis," which was suggestive of long term pathology.
. . .

71.    On October 31, 2006, Claimant sought treatment with Dr. McCaffrey with complaints of pain in both shoulders, his low back, buttocks, and right leg.  Claimant's "work status" was noted as "modified duty."
. . .

73.    On March 3, 2007, Claimant sought "Urgent Care Walk-In" treatment with Dr. McCaffrey with complaints of pain in his left shoulder, low back, left buttock, and right leg.

74.    On March 29, 2007, Claimant sought treatment with Dr. McCaffrey with complaints of pain in his left shoulder, low back, left buttock, and right leg.  Claimant's "work status" was noted as ["]off duty."

75.    On April 19, 2007, Claimant sought treatment with Dr. McCaffrey with complaints of pain in his left shoulder, low back, left buttock, left thigh, right knee, and left foot.

76.    On May 31, 2007, Claimant sought treatment with Dr. McCaffrey with complaints of pain in both shoulders, his low back, left buttock, and right leg, and left leg and foot.

77.    On June 21, 2007, Claimant sought treatment with Dr. McCaffrey with complaints of pain in both shoulders, his low back, left buttock, and both legs and left foot.
. . .

80.    In Claimant's Answers to Employer's First Request for Answers to Interrogatories . . . Claimant . . . revealed that he broke both shoulders in a moped accident in 1990 or 1991, wherein he "flew off the moped and landed with both arms extended".
. . .

92.    Claimant was deposed on January 27, 2006. Claimant testified that at the time of the June 17, 2004 work accident, his arms were straight out approximately three feet from the ground as he helped support a panel weighing 800 to 1200 pounds.  The panel then fell approximately two-and-a-half feet in approximately two seconds or less.  It stopped falling

approximately six inches from the ground.

93. Claimant did not feel immediate pain to the shoulders. He first experienced pain to both shoulders one to one-and-a-half-weeks later. He believed the pain in his shoulders was 4/10 or 5/10, but increased to 6/10 or 7/10 by the third week after the June 17, 2004 work accident.

94. At the trial on April 9, 2010, Dr. Diamond testified that Claimant had . . . a history of previously asymptomatic neck and shoulder pain, a history of prior bilateral shoulder fractures, multiple Waddell's findings.

Dr. Diamond testified that most of the impressions noted from the right shoulder MRA were indicative of long-standing (5-10 years) degenerative conditions. However, the changes noted in the supraspinatus could be considered acute and were not necessarily long-standing. The left shoulder MRA showed similar degenerative changes.

He further testified that the labral and rotator cuff tears that resulted in Claimant's surgeries were not related to the subject work accident, because the mechanism of the subject accident was not consistent with such injuries. He stated that he could definitely say that the labral tearing and degenerative arthritis were not acute injuries.

Dr. Diamond testified that heavy lifting could cause degenerative conditions of the rotator cuff, but it would depend upon the position of the rope and arms. It would take abduction and positioning of the arms overhead to irritate the rotator cuff. Reaching overhead to pull down on a rope would likely lead to a biceps tendonitis rather than a rotator cuff tendonitis. Further, "heavy work" could lead to rotator cuff and labral degeneration.

Labral tearing occurs with compressive injuries, where the humeral head grinds into the labrum, like a fall onto outstretched arms. Although it is possible to tear the labrum on the basis of a traction accident as in this case, but that usually involves damage to the biceps, which is not present [sic]. Therefore, can exclude [sic] traction as the mechanism of injury for the labral tear and arthritis, and the same reasoning applied to rotator cuff injuries. He opined that more likely than not, the tears and degenerative changes pre-existed the June 17, 2004 work accident.

Further, if the tears as seen on the MRA occurred from the work injury, Claimant, more likely than not, would have felt pain immediately. It would also be probable that he would have felt the shoulder pain from the tears immediate [sic], regardless of pain in his back. Dr. Diamond pointed out that Claimant had a complaint of knee pain, and, the back

pain he experienced did not mask that pain.

Dr. Diamond opined that although possible, it was "more likely than not" that the June 17, 2004 accident did not cause, aggravate, or accelerate Claimant's labral tears.  He would expect immediate symptoms given the amount of tears noted on the MRA.

Dr. Diamond further testified that it was virtually impossible to develop the advanced arthritic changes seen on the MRA during the period since the June 17, 2004 work accident.

With regard to Claimant's low back, Dr. Diamond testified that Claimant reached medically stability [sic] approximately one year after the June 17, 2004 work accident.

He further testified that he would generally tell his patients that it would take 12-18 months to fully recover strength after a shoulder surgery.

Dr. Diamond clarified that the supraspinatus changes seen on the MRA in this particular case were not related to the subject work accident for the same reasons.

95.   At trial, Claimant testified that he first noticed symptoms in his shoulders one to two weeks after the June 17, 2004 work accident, while he was washing rice.  The pain in his shoulders thereafter intensified.

96.   The [LIRAB] credits the opinion of Dr. Diamond and finds that Claimant's bilateral shoulder conditions pre-existed the June 17, 2004 work accident and was [sic] not caused, aggravated, or accelerated by said accident.  The [LIRAB] credits Dr. Diamond's expert opinion that Claimant would have experienced immediate symptoms if his shoulder conditions were caused by the June 17, 2004 work injury.  Claimant's argument that his shoulder symptoms were masked by his low back injury is inconsistent with the report of knee symptoms immediately after the June 17, 2004 work accident.  The [LIRAB] also credits Dr. Diamond's opinion that Claimant's shoulder conditions are not consistent with a traction type mechanism of injury.

The LIRAB also made the following conclusions of law

(COL):

"Hawaii Revised Statutes ("HRS") § 386-85(1) creates a presumption in favor of the claimant that the subject injury is causally related to the employment activity. . . .  Furthermore, this presumption may be rebutted by "substantial evidence to the contrary . . . ."  § 386-85, HRS.  The Board

-21-

has applied the rebuttable presumption of compensability.

1.      The [LIRAB] concludes that Claimant did not sustain bilateral shoulder injuries on June 17, 2004, arising out of and in the course of employment. Employer has adduced substantial evidence to rebut or overcome the presumption of compensability.

Although Claimant argues, in part, that his shoulder conditions could have been incurred over the period of his work for Employer, [the LIRAB] makes no determination as to Claimant's cumulative trauma contention, where such theory or contention was raised for the very first time at the trial and in Claimant's Post Hearing Memorandum.

2.      The [LIRAB] concludes that Claimant's periods of [TTD] resulting from the work injury of June 17, 2004 are:
            June 20, 2004 through June 22, 2004
            June 30, 2004 through December 17, 2005
            April 11, 2006 through May 11, 2006
As stated in Alexis v. Kasseebeer v. Paul J. Samarin, AB 2007-207 (October 2, 2009):

    A medical certification of [TTD] requires
    an attending physician to certify that a
    claimant's absence from work is due to
    disability attributed to a specific work
    injury or condition.  Without such
    certification, an award of temporary total
    disability is not proper.

The [LIRAB] interprets the laws and rules to require certifications of disability by the attending physician to be contemporaneous, in writing, and including the date of accident and work injury-related condition(s) for which such disability is certified.

Statements that Claimant's work status as [sic] "off duty" or that he is significantly impaired is [sic] insufficient as a certification of disability without a statement that such impairment or disability is due to the work injury.

The record before the [LIRAB] does not include statements of certification that Claimant remained temporarily and totally disabled due to a work-related injury.  For the period April 11, 2006 through May 11, 2006, the [LIRAB] credits Dr. McCaffrey's Work Restriction Profile and concludes that Claimant was disabled due to the June 17, 2004 work injury.

The [LIRAB] makes no determination as to Claimant's entitlement to TTD benefits after September 4, 2007, which was the medical reports deadline.

> 3. The [LIRAB] concludes Employer is not liable for a penalty for late payment of [TTD] benefits for the period April 6, 2005 to February 2, 2006. There is no evidence to indicate that payments were untimely. Further, the [LIRAB] determined that except for the period April 11, 2006 through May 11, 2006, Claimant was not entitled to TTD benefits after December 17, 2005.

## D.   Appeal to the ICA

On July 21, 2011, Panoke filed a notice of appeal of the LIRAB's decision to the ICA. Panoke raised essentially the same arguments to the ICA that he raised before the LIRAB.

Panoke also argued that it was error for the LIRAB to limit his TTD benefits to certain time periods when Work Star had provided clinical reports that kept Panoke off work from June 30, 2004 through July 12, 2007.

Panoke further asserted that it was error for the LIRAB to fail to assess a penalty against Reef and Seabright because Reef and Seabright's WC-3 form showing TTD payments made for the year 2005 indicated that payments were only made until April 5, 2005, but the LIRAB awarded TTD until December 17, 2005, and there were no grounds for the Director to excuse penalties.

Reef and Seabright argued that Panoke's shoulder injuries were not caused by the June 17, 2004 accident, relying on the reports of Dr. Lau and Dr. Agles, and on Dr. Diamond's testimony.

Reef and Seabright argued that it was not error for the LIRAB to limit Panoke's TTD benefits to certain time periods. Reef and Seabright asserted that the Work Star reports were not sufficient to certify Panoke as disabled because they did not indicate the dates when his disability started, and when he would be able to return to work, as required by HRS § 386-96.

Reef and Seabright also argued that no penalties for late TTD payments were due because the Director's decision of June 13, 2005, only awarded TTD benefits until April 4, 2005. After that, according to Reef and Seabright, the disability was disputed, therefore no TTD benefits were due until October 13, 2006, when the Director extended the TTD period beyond April 5, 2005.

In a summary disposition order (SDO) filed on June 30, 2014, the ICA affirmed the LIRAB's ruling. The ICA first held that the opinions of Drs. Agles, Lau, and Diamond constituted substantial evidence sufficient to rebut the presumption of coverage. In doing so, the ICA rejected Panoke's argument that the opinions were generalized and therefore irrelevant because the opinions "identified specific reasons as to why the shoulder injuries were not work related and why the industrial accident did not exacerbate Panoke's pre-existing condition." The ICA then held that, even though there was some evidence to the

-24-

contrary in the form of Dr. McCaffrey's and Dr. Okamura's opinions, the LIRAB did not err in giving more weight to the "high quantum of evidence" presented by Reef and Seabright.

The ICA next determined that, although the LIRAB's requirement that each disability certification contain a specific statement that the disability is due to work injury was "questionable," any error by the LIRAB in this regard was harmless because the LIRAB did not err in determining the TTD periods. The ICA concluded that the LIRAB's determination of the TTD periods was not error because the first period, from June 20, 2004 to June 22, 2004, was based on a statutory three-day waiting period after the accident and the initial reports of Dr. Diaz-Ordaz. The second period, from June 30, 2004, to December 17, 2005, started when Dr. McCaffrey first placed Panoke off duty, and ran for eighteen months from the June 17, 2004 accident, based on Dr. Diamond's opinion that Panoke's back injury had achieved maximum medical improvement after eighteen months.

The ICA also agreed with Reef and Seabright that the LIRAB did not err in failing to assess penalties. The ICA held that Panoke's argument that he had not received TTD benefits since April 2005 was without merit because the Director's order extending benefits beyond April 2005 was not issued until October 13, 2006.

## II.  Standards of Review

### A.    The LIRAB's decision

Appellate review of a LIRAB decision is governed by
HRS § 91-14(g) (1993), which states that:

> Upon review of the record the court may affirm
> the decision of the agency or remand the case
> with instructions for further proceedings; or it
> may reverse or modify the decision and order if
> the substantial rights of the petitioners may
> have been prejudiced because the administrative
> findings, conclusions, decisions, or orders are:
>
>> (1) In violation of constitutional or
>> statutory provisions; or
>> (2) In excess of the statutory authority
>> or jurisdiction of the agency; or
>> (3) Made upon unlawful procedure; or
>> (4) Affected by other error of law; or
>> (5) Clearly erroneous in view of the
>> reliable, probative, and substantial
>> evidence on the whole record; or
>> (6) Arbitrary, or capricious, or
>> characterized by abuse of discretion
>> or clearly unwarranted exercise of
>> discretion.

We have previously stated:

> [Findings of Fact] are reviewable under the
> clearly erroneous standard to determine if the
> agency decision was clearly erroneous in view of
> reliable, probative, and substantial evidence on
> the whole record.
>
> [Conclusions of Law] are freely reviewable to
> determine if the agency's decision was in
> violation of constitutional or statutory
> provisions, in excess of statutory authority or
> jurisdiction of agency, or affected by other
> error of law.
>
> A [Conclusion of Law] that presents mixed
> questions of fact and law is reviewed under the
> clearly erroneous standard because the
> conclusion is dependent upon the facts and
> circumstances of the particular case.  When
> mixed questions of law and fact are presented,
> an appellate court must give deference to the
> agency's expertise and experience in the
> particular field.  The court should not
> substitute its own judgment for that of the

-26-

agency.

Igawa v. Koa House Rest., 97 Hawaiʻi 402, 405-06, 38 P.3d 570, 573-74 (2001) (internal quotation marks, citations, and brackets in original omitted) (quoting In re Water Use Permit Applications, 94 Hawaiʻi 97, 119, 9 P.3d 409, 431 (2000)).

> [A finding of fact] or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In re Water Use Permit Applications, 94 Hawaiʻi at 119, 9 P.3d at 431 (internal quotation marks and citations omitted).

## B. The LIRAB's statutory interpretation

An appellate court

> generally reviews questions of statutory interpretation de novo, ʻOlelo v. Office of Info. Practices, 116 Hawaiʻi 337, 344, 173 P.3d 484, 491 (2007), but, "[i]n the case of . . . ambiguous statutory language, the applicable standard of review regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous," Vail v. Employees' Ret. Sys., 75 Haw. 42, 66, 856 P.2d 1227, 1240 (1993).

Gillan v. Gov't Employees Ins. Co., 119 Hawaiʻi 109, 114, 194 P.3d 1071, 1076 (2008).

## III.  Discussion

### A.  The LIRAB erred in concluding that the employer presented substantial evidence to rebut the presumption that Panoke's shoulder injuries were a covered employment-related injury

In COL 1, the LIRAB concluded that "[Panoke] did not sustain bilateral shoulder injuries on June 17, 2004, arising out of and in the course of employment" because "[Reef and Seabright] ha[ve] adduced substantial evidence to rebut or overcome the presumption of compensability."  In support of this conclusion, the LIRAB stated that it "credits the opinion of Dr. Diamond and finds that [Panoke's] bilateral shoulder conditions pre-existed the June 17, 2004 work accident and was not caused, aggravated, or accelerated by said accident."

Panoke argues that the LIRAB clearly erred because it should not have relied on the "generalized" reports of Drs. Agles and Lau and the testimony of Dr. Diamond.  Panoke also claims that his degenerative shoulder conditions made him more susceptible to injury, that his shoulders were asymptomatic prior to June 17, 2004, that he did not immediately feel pain in his shoulders because it was masked by his back pain and pain medication, and that his prior shoulder injuries had completely

resolved.[4]

As discussed below, the LIRAB erred in finding that Reef and Seabright presented substantial evidence sufficient to overcome the presumption that Pankoke's shoulder injuries were work-related.  Although Reef and Seabright presented reports from three physicians opining that Panoke's shoulder injuries were not caused by the June 17, 2004 work accident, none of these physicians explained why the June 17, 2004 accident could not have aggravated Panoke's pre-existing shoulder injuries, or, similarly, why Panoke was asymptomatic prior to June 17, 2004, but then started suffering from shoulder problems shortly afterwards.  As a result, the medical reports of the employer's physicians do not provide a sufficient degree of specificity to constitute substantial evidence to rebut the presumption that Panoke's shoulder injuries were work-related.

When determining whether a workers' compensation claim is work-related, it is well established in Hawaiʻi that "it shall be presumed, in the absence of substantial evidence to the contrary . . . [t]hat the claim is for a covered work injury[.]" HRS § 386-85 (1993).  As indicated in <u>Acoustic, Insulation &</u>

---

[4]      Panoke also argues that the LIRAB erred in declining to consider the possibility that his shoulder injuries were caused cumulatively as a result of his heavy labor at work.  Because of our holding, we do not reach this issue.

Drywall, Inc. v. Labor and Indus. Relations Appeal Bd., 51 Haw. 312, 316, 459 P.2d 541, 544 (1969), to rebut the presumption, the employer has the burden of going forward with the evidence, which is the burden of production, as well as the burden of persuasion. The burden of production means that "the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related." Nakamura v. State, 98 Hawaiʻi 263, 267, 47 P.3d 730, 734 (2002) (citation omitted). In evaluating whether the burden of producing substantial evidence has been met, "the slightest aggravation or acceleration of an injury by the employment activity mandates compensation." Van Ness v. State, Dep't of Educ., 131 Hawaiʻi 545, 562, 319 P.3d 464, 481 (2014) (citation omitted).

If the employer meets the burden of production, the burden of persuasion requires that "the trier of fact . . . weigh the evidence elicited by the employer against the evidence elicited by the claimant." Igawa, 97 Hawaiʻi at 409, 38 P.3d at 577 (citation omitted). In evaluating whether the burden of persuasion has been met in the workers' compensation context, "the broad humanitarian purpose of the workers' compensation statute read as a whole requires that all reasonable doubts be resolved in favor of the claimant[.]" Van Ness, 131 Hawaiʻi at 558, 584 P.3d at 477 (quoting Lawhead v. United Air Lines, 59

Haw. 551, 560, 584 P.3d 119, 125 (1978)) (emphasis omitted); see also Akamine v. Hawaiian Packing & Crating Co., 53 Haw. 406, 408, 495 P.2d 1164, 1166 (1972).  In this case, the employer failed to meet its initial burden of producing substantial evidence, and we therefore do not reach the burden of persuasion.

In the workers' compensation context, "substantial evidence" means "a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable [person] that an injury or death is not work connected."  Id. at 267-68, 47 P.3d at 734-35 (quoting Flor v. Holguin, 94 Hawaiʻi 70, 79, 9 P.3d 382, 391 (2000)).  As this court explained in Van Ness, this is a "high burden" placed on the employer, which is necessary because of the purpose of Hawaii's workers' compensation law:

> The legislature has decided that work injuries are among the costs of production which industry is required to bear.  Workmen's compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault.  They represent a socially enforced bargain:  the employee giving up his right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries.

131 Hawaiʻi at 558, 319 P.3d at 477 (quotation marks, brackets, and citation omitted).

Two decisions by this court--Akamine and Nakamura--

illustrate the "substantial evidence" standard.

In <u>Akamine</u>, the claimant died from a heart attack, and the employer's experts, relying on the fact that heart disease originates early in life and physical exercise generally reduces the risk of heart disease, testified that there was no connection between the employee's heart condition and his physical exertion at work. 53 Haw. at 410-12, 495 P.2d at 1167-68. This court held that such testimony was generalized and thus did not rebut the presumption of coverage. <u>Id.</u> at 412-14, 495 P.2d at 1168-69. This court also noted that "[t]he primary focus of the medical testimony should have been a discussion on whether the employment effort, whether great or little, in any way aggravated Mr. Akamine's heart condition which resulted in his death." <u>Id.</u> at 412, 495 P.2d at 1168.

In <u>Nakamura</u>, the claimant, an employee of the University of Hawaiʻi (UH), claimed he had sustained a psychiatric stress injury at work due to "'long term inhumane treatment' and harassment . . . ." 98 Hawaiʻi at 264, 47 P.3d 730 at 731. Nakamura claimed his inability to work was a result of this treatment by his supervisors and also an IRS garnishment of his wages. <u>Id.</u> at 264-65, 47 P.3d at 731-32. At trial, Nakamura's regular psychiatrist testified that she believed Nakamura had a pre-existing psychiatric illness that was

-32-

exacerbated by both the IRS garnishment and the UH work environment. Id. at 266, 47 P.3d at 733. UH relied on the report of another psychiatrist, Dr. Ponce, who had examined Nakamura at UH's request and testified that Nakamura had a pre-existing psychiatric illness that was exacerbated by the IRS garnishment but not his treatment by UH supervisors. Id. The LIRAB credited Dr. Ponce's testimony, and thus found that Nakamura's work did not cause his injury. Id.

This court in Nakamura clarified the Akamine decision, and stated that "the court [in Akamine] was intending to illustrate that a reasonable degree of specificity is required in order for medical opinion evidence to rebut the presumption of compensability." 98 Hawai'i at 269, 47 P.3d at 736. This court went on to affirm the LIRAB's decision and held that Dr. Ponce's opinion constituted substantial evidence because

> Dr. Ponce did more than opine generally that Nakamura
> had an illness predating his employment with UH. Dr.
> Ponce identified symptoms of paranoia and accompanying
> behaviors attributable to Nakamura's pre-existing
> illness as the source of Nakamura's pre-garnishment
> work-related difficulties, pointing out that the
> behaviors were similar to difficulties that Nakamura
> had encountered before starting work at UH.

Id.

In the present case, Reef and Seabright bore the initial burden of producing substantial evidence to rebut the presumption that Panoke's shoulder injuries were the result of

-33-

the June 17, 2004 work accident.  Reef and Seabright rely on the testimony of Dr. Diamond, and the reports of Drs. Agles and Lau, and argue that these met their burden to produce substantial evidence.

At trial, Dr. Diamond testified that the labral and rotator cuff tears found in the MRIs of Panoke's shoulders were most likely not the result of the June 17, 2004 work accident. Dr. Diamond's reasons for this opinion were that the traction mechanism of Panoke's June 17, 2004 accident was inconsistent with the shoulder injury, Panoke lacked any injury to his biceps, Panoke did not complain of pain in his shoulders for approximately two weeks after the June 17, 2004 work accident, and, according to Dr. Diamond, Panoke's shoulder injuries were more consistent with degenerative changes over time resulting from his previous shoulder fractures, rather than the June 17, 2004 accident.  Drs. Agles and Lau also opined that Panoke's shoulder injuries were not related to the June 17, 2004 accident because of Panoke's delayed pain complaints in his shoulders.

However, Panoke's treating physician, Dr. McCaffrey, concluded in a January 31, 2005 letter that Panoke's shoulder injuries were related to the June 17, 2004 accident.  As the LIRAB noted in FOF 29, Dr. McCaffrey explained that Panoke had no shoulder complaints or ongoing problems with his shoulder prior

-34-

to the June 17, 2004 accident and had "fully and totally" recovered from his 1991 vehicle accident in which he fractured his shoulders "without residual symptoms or impairment." Dr. McCaffrey also noted that Panoke had been involved in heavy work activities immediately prior to June 17, 2004, and had been "clinically asymptomatic" until the June 17, 2004 accident.

None of the medical reports submitted by Reef and Seabright, or Dr. Diamond's testimony at the LIRAB hearing, rebutted these bases for Dr. McCaffrey concluding that Panoke's shoulder injuries were related to the June 17, 2004 accident. Moreover, all three of the employer's physicians focused almost entirely on explaining why Panoke's work accident on June 17, 2004 could not have caused his shoulder injuries without adequately explaining how the accident could not have caused "the slightest aggravation or acceleration of an [existing] injury." Van Ness, 131 Hawaiʻi at 562, 319 P.3d at 481. Instead, the focus of the employer's medical reports "should have been a discussion on whether the employment . . . in any way aggravated Mr. [Panoke's] [shoulder] condition which resulted in his [injury]." Akamine, 53 Haw. at 412, 495 P.2d at 1168 (emphasis added).

Given that Panoke had a history of shoulder injuries and his MRI scans showed degenerative arthritis in both

shoulders, which Dr. Diamond acknowledged was both "longstanding" and most likely pre-existing (because, as the LIRAB noted in FOF 94, "it was virtually impossible to develop the advanced arthritic changes seen on the MRA during the period since the June 17, 2004 work accident"), evidence showing why Panoke's June 17, 2004 accident could not have aggravated these conditions was necessary for the employer to adduce "substantial evidence" and overcome the presumption of coverage.

Indeed, at the LIRAB trial, Dr. Diamond even acknowledged that it was "possible" that the June 17, 2004 accident might have aggravated labral tears that pre-existed in Panoke's shoulders. Although Dr. Diamond testified that he thought that it was "more likely than not" that the work accident had not aggravated Panoke's shoulder injuries, his only explanation was that "[h]e would expect immediate symptoms given the amount of tears" Panoke suffered. However, this explanation was not sufficient to constitute "substantial evidence." First, one of the employer's own physicians, Dr. Lau, acknowledged that the pain experienced with the type of injuries Panoke suffered would not necessarily be immediate, but could have manifested "within several days to a week." Second, although it is not necessary for the employer to provide evidence showing definitively what was the cause of the claimant's injury (i.e.,

something other than the work accident), there is nothing in the record to explain why Panoke would have started experiencing serious shoulder pain approximately two weeks after the work accident if the work accident had not caused the injury or aggravated some pre-existing injury.

Thus, unlike the physician in <u>Nakamura</u>, Reef and Seabright's physicians did not do more than "opine generally that [Panoke] had an [injury] predating his employment," <u>Nakamura</u>, 98 Hawaiʻi at 269, 47 P.3d at 736, because the physicians did not consider how Panoke's prior injury might have been affected or aggravated by the June 17, 2004 accident. As a result, the LIRAB erred in concluding that Reef and Seabright had adduced substantial evidence to overcome the presumption that Panoke's shoulder injuries were related to the June 17, 2004 work accident as he alleged.

We therefore vacate the LIRAB's ruling and remand the case to the LIRAB for further proceedings consistent with this opinion, including a determination on the merits of Panoke's eligibility for TTD benefits.

**B.    The LIRAB erred in denying Panoke's TTD benefits based on deficiencies in the certifications of disability submitted by Panoke's physicians**

In COL 2, the LIRAB concluded that:

Claimant's periods of [TTD] resulting from the work

-37-

injury of June 17, 2004 are:
                June 20, 2004 through June 22, 2004
                June 30, 2004 through December 17, 2005
                April 11, 2006 through May 11, 2006

        As stated in <u>Alexis v. Kasseebeer v. Paul J.
Samarin, AB 2007-207</u> (October 2, 2009):

        A medical certification of [TTD] requires
        an attending physician to certify that a
        claimant's absence from work is due to
        disability attributed to a specific work
        injury or condition.  Without such
        certification, an award of temporary total
        disability is not proper.

        The [LIRAB] interprets the laws and rules to
        require certifications of disability by the attending
        physician to be contemporaneous, in writing, and
        including the date of accident and work injury-related
        condition(s) for which such disability is certified.
        Statements that Claimant's work status as [sic]
        "off duty" or that he is significantly impaired is
        [sic] insufficient as a certification of disability
        without a statement that such impairment or disability
        is due to the work injury.
        The record before the board does not include
        statements of certification that Claimant remained
        temporarily and totally disabled due to a work-related
        injury.  For the period April 11, 2006 through May 11,
        2006, the Board credits Dr. McCaffrey's Work
        Restriction Profile and concludes that Claimant was
        disabled due to the June 17, 2004 work injury.
        The [LIRAB] makes no determination as to
        Claimant's entitlement to TTD benefits after
        September 4, 2007, which was the medical reports
        deadline.

        The LIRAB therefore discredited Panoke's Work Star

reports because they did not indicate that Panoke's "off work"

status was due to a work injury--in this case Panoke's back

injury.  The ICA noted that the LIRAB's requirements that

physicians' reports must include the dates of the accident and

the disability "were based upon statutory authority [in HRS

§ 386-96] and were not error as a matter of law."  The ICA then

-38-

held that although "the LIRAB's requirement that each certification of disability contains a specific statement that the impairment/disability is due to work injury is questionable . . . the LIRAB did not err in its determination of the TTD benefits period."

Panoke argues that although the Work Star reports did not include all of the information required by the LIRAB, the reports nevertheless sufficiently certified Panoke as disabled because "[a] claimant should not be penalized simply because his physician failed to properly fill out a report." Therefore, according to Panoke, the LIRAB should have awarded him TTD benefits for the entire period for which the Work Star reports placed him off work duty.

Although part III.A of this opinion vacates and remands Panoke's claim to the LIRAB for redetermination of the TTD benefits he is due, clarification of the relevant law is warranted.[5] We hold that the LIRAB may not deny a claimant

_____

[5]     Compare Zhang v. State, Dept. of Land & Natural Res., No. CAAP-11-0001106 (App. Sept. 15, 2014) (SDO) (holding that a physician's document "did not comport with the [statutory] requirement that it include the 'dates of disability' because it simply constituted a plan for future treatment and did not specify any range of time the document was supposed to cover"); Boydstun v. Polynesian Cultural Ctr., No. CAAP-11-0000803 (App. Sept. 11, 2014) (SDO) (affirming the LIRAB's determination that "there were no contemporaneous medical certifications" for unaddressed "gap" periods); Custino v. State, Dept. of Transp., No. CAAP-11-0000570 (App. May 15, 2014) (SDO) (holding that the failure of a physician to include the information required in HRS § 389-96(2), including the dates of disability and the return to work date, violates

(continued...)

benefits based on deficiencies in a physician's certifications of

disability.

HRS § 386-96[6] requires a physician to include in

_____

[5](...continued)
HRS § 389-96(2) as an improper certification, and thus justifies a denial of
the claimant's TTD benefits) with Alayon v. Urban Management Corp., No. CAAP
11-0000676 (App. Dec. 31, 2014) (SDO) (vacating the LIRAB's ruling that the
claimant was not entitled to TTD benefits because "the [LIRAB] cannot deny a
claimant's request for TTD benefits based solely on a physician's failure to
submit the certifications of disability in the proper form").

[6]      HRS § 386-96 reads:

        (a) Any physician, surgeon, or hospital that has given any
        treatment or rendered any service to an injured employee shall
        make a report of the injury and treatment on forms prescribed by
        and to be obtained from the department as follows:

                (1) Within seven days after the date of first attendance or
                service rendered, an initial report shall be made to the
                department and to the employer of the injured employee in
                the manner prescribed by the department;

                (2) Interim reports to the same parties and in the same
                manner as prescribed in paragraph (1) shall be made at
                appropriate intervals to verify the claimant's current
                diagnosis and prognosis, that the information as to the
                nature of the examinations and treatments performed is
                complete, including the dates of those treatments and the
                results obtained within the current reporting period, the
                execution of all tests performed within the current
                reporting period and the results of the tests, whether the
                injured employee is improving, worsening, or if "medical
                stabilization" has been reached, the dates of disability,
                any work restrictions, and the return to work date. When an
                injured employee is returned to full-time, regular, light,
                part-time, or restricted work, the attending physician shall
                submit a report to the employer within seven calendar days
                indicating the date of release to work or medical
                stabilization;
        . . .

        (b) No claim under this chapter for medical treatment, surgical
        treatment, or hospital services and supplies, shall be valid and
        enforceable unless the reports are made as provided in this
        section, except that the director may excuse the failure to make
        the report within the prescribed period or a nonsubmission of the
        report when the director finds it in the best interest of justice
                                                        (continued...)

-40-

reports all of the information listed in HRS § 386-96(2), including the "dates of disability."  In addition to the required information, HRS § 386-96 provides the consequences of not including such information:  "[n]o claim under this chapter <u>for medical treatment, surgical treatment, or hospital services and supplies</u>, shall be valid and enforceable unless the reports are made as provided in this section[.]"  HRS § 386-96(b) (emphasis added).

Similarly, the Department of Labor and Industrial Relations (DLIR) administrative rule on this issue also allows for the denial of payment to the physician in the event that a disability certification does not comply with the reporting requirements.  Hawaiʻi Administrative Rules (HAR) § 12-15-80 provides:

> (a) Any provider of service required by chapter 386, HRS, this chapter, or any related rules to make and submit reports of an injury and treatment shall:
>
> > (1) Submit those reports to the director and the self-insured employer, or the insurer of the employer when the employer is not self-insured, whichever is applicable; and
>
> > (2) Itemize its statement of services rendered in a manner showing the date of injury, diagnosis, date of each visit or service, the appropriate code number used as the basis for the charge, and the fee not to exceed the maximum allowed under the medical fee schedule.

(...continued)
        to do so.

No service charge for preparing and submitting reports required by section 386-96, HRS, and any related rules shall be allowed.

(3) Interim WC-2 reports shall be submitted monthly with the corresponding billing invoice, if applicable, to the employer and shall include the following:

(A) Current diagnosis and prognosis;

(B) Complete information as to the nature of the examination(s) and treatments performed, dates of those treatments, and the results obtained within the current reporting period;

(C) A complete listing of all tests performed within the current reporting period and the results of the tests;

(D) A statement of whether the injured employee is improving, worsening, or if "medical stabilization" has been reached; and

(E) Dates of disability, work restrictions, if any, and return to work date.

(c) <u>The repeated failure of a physician, surgeon, hospital, or provider of service to comply with chapter 386, HRS, and any related rules shall be a reasonable basis for an employer to refuse to pay or withhold payment for services rendered</u>.

(Emphasis added).

Therefore, according to a plain reading of the rule, the consequence of a physician not including the required information on a report is that <u>the physician</u> may not be compensated for medical services rendered. Moreover, HAR § 12-15-80(c) provides that this sanction may only be applied after a physician's "repeated failure" to comply with the requirements.

However, even though HRS § 386-96 and HAR § 12-15-80

permit denial of payment to a <u>physician</u> who fails to comply with the reporting requirements, neither the statute nor the administrative rule provides that an <u>employee's</u> claim for TTD benefits must be denied due to a physician's non-compliance. Moreover, those provisions must be read in pari materia with the rest of the workers' compensation statute, and in particular, the provision that establishes the employee's entitlement to TTD, HRS § 386-31(b) (Supp. 2013). That section provides that when "a work injury causes total disability not determined to be permanent in character, the employer, for the duration of the disability, but not including the first three calendar days thereof, shall pay the injured employee" the prescribed benefits.

There is nothing in that provision which prescribes a particular method of proof, or that suggests that information not presented in accordance with HRS § 386-96 and HAR § 12-15-80 cannot be considered. To be sure, the LIRAB must assess the quality of the evidence that is presented, to determine whether the necessary showing has been made. However, in doing so it cannot rely on the physician's failure to comply with the certification requirements set forth in those provisions. To the extent that the Board's analysis in COL 2 suggests otherwise, it is clearly erroneous, and the ICA erred in finding that the LIRAB properly determined Panoke's benefits period.

**C.    The LIRAB did not err in denying Panoke's request for additional penalties against Reef**

The LIRAB held in COL 3 that "[Reef and Seabright] [are] not liable for a penalty for late payment of [TTD] benefits for the period April 6, 2005 to February 2, 2006" because "[t]here is no evidence to indicate that payments were untimely." Panoke argues that the LIRAB erred because Reef and Seabright were required to pay TTD benefits to Panoke as they accrued for the period January 5, 2005 through December 17, 2005, but that Reef and Seabright did not pay the TTD benefits for this period until much later.[7]  Panoke states that in June 2005, the Director ruled that Panoke had suffered compensable injuries to his back and shoulders, and that Panoke's physician submitted disability certificates throughout 2005 certifying him as off work duty. According to Panoke, HRS § 386-31(b) requires payment of TTD

---

[7]    Panoke contends that "[t]he WC-3 reports . . . for 2004 and 2005 demonstrated that [Reef and Seabright] failed to pay TTD benefits "from 1/5/2005 - 12/17/2005 and from 5/6/2005 - 12/17/2005[.]"  However, the 2004 WC-3 form shows that in 2004, Reef and Seabright paid TTD benefits to Panoke for the periods of June 20, 2004 through June 22, 2004, and June 30, 2004 through January 4, 2005.  The 2005 WC-3 shows that Reef and Seabright paid TTD benefits to Panoke for the period of January 5, 2005 through April 5, 2005. Panoke has not pointed to any other evidence that the payments for the period January 1, 2005 through April 5, 2005, were late.  Panoke's argument appears to be based on the fact that payments for the period January 5, 2005 through April, 5, 2005 did not appear on the WC-3 for 2004.  However, as Panoke acknowledges, the employer is required to file the WC-3 by January 31 of each year, showing payments made for the previous year.  Payments from January through April 2005 therefore could not have appeared on the 2004 WC-3. Therefore, the only evidence in the record of any late payments, based on the 2005 WC-3, is for the period April 6, 2005 through December 17, 2005, because it is clear from the 2005 WC-3 that Reef and Seabright did not make these payments in 2005.

without waiting for a decision from the Director, so the ICA therefore erred in holding that TTD was not due until the Director issued its second decision on October 13, 2006, extending TTD benefits beyond April 5, 2005.  Panoke contends that "[a] carrier should not be allowed to withhold TTD, gambling that on appeal there may be a ruling that TTD was not due."

The timing of TTD payments and the penalties for untimely payments are governed by HRS §§ 386-31 and 386-92.  HRS § 386-31(b) (Supp. 2012) provides, in relevant part:

> The employer shall pay temporary total disability benefits promptly as they accrue to the person entitled thereto without waiting for a decision from the director, unless this right is controverted by the employer in the employer's initial report of industrial injury.  The first payment of benefits shall become due and shall be paid no later than on the tenth day after the employer has been notified of the occurrence of the total disability, and thereafter the benefits due shall be paid weekly except as otherwise authorized pursuant to section 386-53.

(Emphasis added).

HRS § 386-31(b) therefore requires that an employer pay TTD benefits to an employee within ten days of the employer being notified of the disability, without waiting for a decision from the Director, unless the employer controverts the employee's claim "in the employer's initial report of industrial injury."

HRS § 386-92 (Supp. 2012) provides:

> If any compensation payable under the terms of a final decision or judgment is not paid by a self-insured employer or an insurance carrier within thirty-one days after it becomes due, as provided by the final

> decision or judgment, or if any temporary total
> disability benefits are not paid by the employer or
> carrier within ten days, exclusive of Saturdays,
> Sundays, and holidays, after the employer or carrier
> has been notified of the disability, and where the
> right to benefits are not controverted in the
> employer's initial report of industrial injury or
> where temporary total disability benefits are
> terminated in violation of section 386-31, there shall
> be added to the unpaid compensation an amount equal to
> twenty per cent thereof payable at the same time as,
> but in addition to, the compensation, unless the
> nonpayment is excused by the director after a showing
> by the employer or insurance carrier that the payment
> of the compensation could not be made on the date
> prescribed therefor owing to the conditions over which
> the employer or carrier had no control.

(Emphasis added).

The legislative purpose behind HRS § 386-92 is "to assess a [20]% penalty[8] in cases where an employer or his [or her] insurance carrier is notified of a work injury, does not deny liability for said injury under the law, and still neglects to pay compensation to a [TTD] worker within 10 days of such notification." S. Stand. Comm. Rep. No. 216, in 1971 Senate Journal, at 878; H. Stand. Comm. Rep. No. 757, in 1971 House Journal, at 1007 (emphasis added). Further comments in the committee reports also suggest that the legislature did not intend for employers contesting a determination of liability by the Director to be required to pay ongoing TTD benefits while the appeal is pending:

---

[8] The penalty was changed from ten percent to twenty percent in 1995. 1995 Haw. Sess. Laws Act 234, § 14 at 613.

> Even upon the issuance of such an order [by the Director], the employer or insurance carrier can still wait until the 30 day appeal period has run before making payment.
> This Bill proposes to grant the director discretion to add a 10% penalty on the compensation payments <u>in cases where liability is not denied and there is no question that the compensation is due the injured worker.</u>

S. Stand. Comm. Rep. No. 216, in 1971 Senate Journal, at 878 (emphasis added); <u>see</u> <u>also</u> H. Stand. Comm. Rep. No. 757, in 1971 House Journal, at 1007.

Here, the LIRAB did not err in declining to assess penalties against Reef and Seabright. First, TTD payments for the period dating from April 5, 2005 to December 17, 2005 did not become due as a result of a "final judgment" after the Director's June 13, 2005 decision because Reef and Seabright timely appealed to the LIRAB. A decision by the Director shall be "final and conclusive between the parties . . . <u>unless within twenty days after a copy has been sent to each party, either party appeals therefrom to the appellate board</u> . . . ." HRS § 386-87 (1993) (emphasis added). The Director's decision therefore was not "final" according to the statute.

Although Reef and Seabright's motion to stay payments was denied, this related only to the payments ordered by the Director, i.e., TTD payments through April 5, 2005. The Director

did not order ongoing payments beyond that date.[9]

Second, although Reef and Seabright were notified of Panoke's disability during the period dating from April 5, 2005 through December 17, 2005, they are not subject to penalties for not making immediate payments because the claim was still controverted. HRS § 386-31(b) provides that the employer or carrier must pay TTD benefits within ten days after notification "unless this right is controverted by the employer in the employer's initial report of industrial injury." Here, Reef and Seabright were unable to controvert Panoke's shoulder injury in the initial report because Panoke had not complained of any shoulder injury. Reef and Seabright did, however, controvert the shoulder injuries as soon as Panoke made those claims. Holding that Reef and Seabright had not controverted Panoke's shoulder injury for the purposes of HRS § 386-92, merely because they had not done so in the initial injury report of June 17, 2004, would have the effect of allowing employees to subsequently add any injuries to their claims and prevent their employers from controverting them without paying a penalty.

Furthermore, Panoke's shoulder injury claims were still controverted after the Director's June 13, 2005 decision. Reef

_____

[9] This differed from the Director's October 13, 2006 decision, in which the Director did order ongoing payments, and with which Reef and Seabright appear to have complied.

-48-

and Seabright immediately appealed the decision, so it was not a final judgment with respect to whether Panoke's shoulder injuries were compensable work-related injuries. The Director also made no determination as to Reef and Seabright's obligation to pay TTD benefits after April 5, 2005. Because coverage for Panoke's shoulder injuries was still in dispute for the period dating from April 5, 2005 to December 5, 2005, and payments for that period had not been subject to a final judgment, Reef and Seabright are not liable for additional penalties under HRS § 386-92.

## V. Conclusion

The LIRAB erred in concluding that Reef and Seabright adduced substantial evidence sufficient to overcome the presumption that Panoke's shoulder injuries were related to his June 17, 2004 work accident. Further, the LIRAB erred in relying on deficiencies in Panoke's treating physicians' disability certifications when it limited Panoke's TTD benefits. We therefore vacate the ICA's July 31, 2014 judgment on appeal and the LIRAB's June 14, 2011 decision and order, and remand to the LIRAB for further proceedings consistent with this opinion.

Wayne H. Mukaida
for petitioner

Colette H. Gomoto
for respondent

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

