***  NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER  ***

**Electronically Filed
Supreme Court
SCWC-11-0001106
08-AUG-2016
07:49 AM**

SCWC-11-0001106

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---

JULIANA J. ZHANG,
Petitioner/Claimant-Appellant,

vs.

STATE OF HAWAI'I, DEPARTMENT OF LAND AND NATURAL RESOURCES,
Respondent/Employer-Appellee, Self-Insured.

---

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0001106; CASE NO. AB-2003-365 (2-94-41072))

MEMORANDUM OPINION
(By: Recktenwald, C.J., Nakayama, McKenna, and Pollack, JJ.,
and Circuit Judge Browning, in place of Wilson, J., recused)

## I.    Introduction

This case addresses decisions made by the Labor and Industrial Relations Board ("LIRAB") regarding workers' compensation benefits for a mental stress injury suffered by a former employee of the State of Hawai'i Department of Land & Natural Resources ("DLNR").  Specifically, Juliana J. Zhang ("Zhang") asserts that the LIRAB erred in determining that

(1) she is not entitled to retroactive temporary total disability benefits from May 5, 2004 to the present due to deficiencies in her physicians' certifications of disability, and (2) she was not terminated from employment solely due to her filing of this workers' compensation claim, which would constitute a violation of Hawai'i Revised Statutes ("HRS") § 386-142 (1993).[1]

As to the first issue, we hold that, based on Panoke v. Reef Development of Hawaii, Inc., 136 Hawai'i 448, 363 P.3d 296 (2015), the LIRAB erred in denying Zhang's temporary total disability benefits after May 5, 2004 based solely on deficiencies in the certifications of disability submitted by Zhang's physician. As to the second issue, although it appears Zhang correctly asserts that she was authorized to continue

---

[1] HRS § 386-142 provided then and now as follows:

It shall be unlawful for any employer to suspend or discharge any employee solely because the employee suffers any work injury which is compensable under this chapter and which arises out of and in the course of employment with the employer unless it is shown to the satisfaction of the director that the employee will no longer be capable of performing the employee's work as a result of the work injury and that the employer has no other available work which the employee is capable of performing. Any employee who is suspended or discharged because of such work injury shall be given first preference of reemployment by the employer in any position which the employee is capable of performing and which becomes available after the suspension or discharge and during the period thereafter until the employee secures new employment. This section shall not apply to the United States or to employers subject to part III of chapter 378.

working in the United States at the time of her July 27, 1994 termination by DLNR, the LIRAB did not err in ruling that Zhang was not terminated solely due to her filing of a workers' compensation claim, in violation of HRS § 386-142.  As argued by DLNR, res judicata principles preclude the finding sought by Zhang because the circuit court found in her prior lawsuit that Zhang had been terminated from employment because of DLNR's belief that Zhang had failed to submit documents necessary for the extension of her work authorization.  The judgment incorporating this finding was not appealed, giving it preclusive effect, which prohibits a finding that Zhang was terminated solely due to her filing of this workers' compensation claim.

We therefore vacate in part the Intermediate Court of Appeals' ("ICA") October 24, 2014 Judgment on Appeal and the LIRAB's December 6, 2011 Decision and Order, and remand the case to the LIRAB for further proceedings consistent with this opinion.

## II.  Background

### A.   Background

Zhang is an electrical engineer originally from the People's Republic of China, who fled to the United States in 1990 with her former husband.  Zhang entered the United States as the spouse of a Chinese student permitted to work pursuant to

3

Executive Order 12711 of 1990, which granted Chinese nationals who were in the United States after June 5, 1989 employment authorization through January 1, 1994. See Exec. Order No. 12711 § 3, 55 Fed. Reg. 13897 (April 11, 1990).

On June 24, 1992, Zhang began working for DLNR on a renewable annual contract basis, checking engineering aspects of water project proposals. Upon beginning employment, she filled out the requisite United States ("U.S.") Department of Justice, Immigration and Naturalization Service ("INS") Form I-9 to verify her employment eligibility. Pursuant to the INS's "Handbook for Employers" in effect at the time, an employer was required to verify an incoming employee's employment authorization by having a new employee submit either a document from List A, which would establish both identity and employment eligibility (such as a U.S. passport), or one document from List B to establish identity (such as a state driver's license) and one document from List C to establish employment eligibility (such as a U.S. Social Security Number Card ("Social Security Card") other than one reflecting "not valid for employment").

Zhang submitted a Hawaiʻi Driver's License valid until May 16, 1995 and a standard Social Security Card, which did not contain a statement that it was not valid for employment. In the Form I-9, she also completed a box attesting that she was an "alien authorized to work until 01/01/94" under a specific alien

4

or admission number as provided by Executive Order 12711 of 1990. Effective October 19, 1992, however, Executive Order 12711 was superseded by the Chinese Student Protection Act of 1992, Pub. L. No. 102-404, 106 Stat. 1969 ("CSPA"). The CSPA allowed Chinese nationals in the United States subject to Executive Order 12711 to apply for an adjustment to legal permanent resident status. CSPA § 2(a)(1) also specifically provided that upon application for adjustment of status, the Chinese national would be "deemed approved." CSPA, Pub. L. No. 102-404, § 2, 106 Stat. at 1969.

Around March of 1993, a permanent position became available at DLNR, and Zhang's direct supervisors apparently encouraged her to apply. Also, apparently pursuant to Zhang's request, in May of 1993, DLNR drafted an H-1B petition to have Zhang classified as a temporary non-immigrant in a specialty occupation for a three year employment period. It appears, however, that although DLNR thought this petition had been submitted, it had not.

It also appears that Zhang learned about passage of the CSPA because on June 30, 1993, she submitted a Form I-485 to the INS to apply for an adjustment of her status to that of a legal permanent resident. Although pursuant to the CSPA, she apparently may have been "deemed approved" upon submission of

her adjustment application, on October 8, 1993, she called the INS to inquire about the status of this application, and was informed it was still pending.  From that date to December 15, 1993, Zhang visited the Honolulu INS office twice to follow up, but the INS said there had been no change in status.  On December 15, 1993, Zhang wrote to the INS to inquire about the status of her application.  On January 28, 1994, the INS responded that her application was still pending.  As noted above, however, the CSPA provided that upon submission of her application for adjustment of status, Zhang's adjustment of status to legal permanent resident had been "deemed approved."

According to Zhang, she had not received any negative feedback or evaluations, but it appears that by early 1994, DLNR had some concerns regarding her work.  DLNR Deputy Director Rae Loui ("Loui") met with Zhang on March 18, 1994 to discuss her work hours, and on March 28, 1994, sent Zhang a memorandum, the purpose of which was "to make clear your work hours, name of supervisor, and our expectations."  The memorandum informed Zhang that:  (1) her work hours, per her request, were 8:30 a.m. to 5:15 p.m., with two 15 minute coffee breaks and one 45 minute lunch break; (2) because her previous supervisor was on loan to another organization, her direct supervisor was David Higa and that Higa's supervisor was Ed Sakoda; (3) she was to keep

personal calls to a minimum and was not allowed to sell stamps during work hours; and (4) she would need to clock in her time four times per day.  This memorandum was apparently triggered by complaints from Zhang's co-workers.

Zhang's union, the Hawai'i Government Employees Association ("HGEA"), filed a step 1 grievance on her behalf on April 25, 1994, then a step 2 grievance on May 27, 1994, alleging that the requirements placed on Zhang were discriminatory, arbitrary, and capricious, and demanding a rescission and expungement of the memorandum as well as a stop to "this type of discrimination in the workplace."

On May 25, 1994, Zhang's supervisor allegedly told her he would be giving her both verbal and written warnings if he heard any more complaints about her.

On June 22, 1994, Zhang orally reported a worker's compensation mental stress type injury to DLNR, and went to see physician Dr. Nola Mirikitani ("Dr. Mirikitani") for the first time.  Dr. Mirikitani diagnosed Zhang with major depression, certified her as disabled as of June 22, 1994, and noted that Zhang would be able to return to regular work on July 6, 1994. In the WC-2 Physicians' Report Dr. Mirikitani prepared, she noted a date of injury/illness of "03/?/94," noted that the work injury was the only cause of Zhang's condition, certified Zhang as disabled as of June 22, 1994, indicated a need for further

medical rehabilitation, and noted that Zhang would be able to return to regular work on July 6, 1994.

On June 27, 1994, Zhang faxed an HGEA Unit 13 step 1 labor grievance form to DLNR's Higa concerning the May 25, 1994 incident, asserting Higa had made the statement in retaliation for the previous grievance Zhang had brought, and requested that the statement be rescinded. Zhang returned to work on June 28, 1994, despite Dr. Mirikitani's July 1, 1994 WC-2 stating that Zhang could return to work on July 6th. Zhang obtained workers' compensation forms on that day; Dr. Miritani's office faxed in a work excuse for June 22nd to the 28th.

On June 28, 1994, DLNR Chair Keith Ahue ("DLNR Chair Ahue") wrote to HGEA, agreeing to rescind the March 28, 1994 memo changing Zhang's work schedule, and ruling in favor of HGEA's previous grievance that alleged unfair changes to Zhang's work schedule. On June 30, 1994, Loui wrote a "courtesy reminder" to Zhang, stating that her limited term employment would end on September 30, 1994. Soon thereafter, HGEA filed a step 1 grievance regarding this letter, alleging that the "courtesy reminder" was "disciplinary, and in retaliation for her having filed other grievances in the past." On June 30, 1994, Higa sent a letter to Zhang via certified mail, stating that her June 27, 1994 grievance would not be considered because it had been

8

made more than twenty days after the alleged May 25, 1994 incident, in contravention of the grievance procedure in the Unit 13 Contract Agreement ("CBA"), which required that a grievance be submitted within twenty working days.[2]

On July 1, 1994, Zhang sought treatment from Dr. Mirikitani for a second time. Zhang said she had been back at work for three days without problems until the day before, when she received a letter that her position would not be renewed in the fall due to budget cuts. She had called in sick that day, said she was unable to function and that she had an attorney. She said she still felt tired, although her headaches were not as bad. She also spent a great deal of time worrying about a change in date for her return to work slip. Dr. Mirikitani continued Zhang on anti-depressant medication, and noted she could return to work on July 8, 1994.

On July 1, 1994, DLNR prepared a WC-1 Employer's Report of Industrial Injury, noting that Zhang had sustained a stress-related injury allegedly as "a result of mental stress and pressure caused by work supervisors and brought about by a hostile work environment[,]" checked "Yes" to "Is Liability

---

[2]     The twenty working day deadline expired on Friday, June 24, 1994, the working day before her grievance.

9

Denied," but noted "Pending Investigation" as to "If Liability Denied—Why?"[3]

Zhang saw Dr. Mirikitani again on July 8, 1994. Dr. Mirikitani changed Zhang's medication, and noted that Zhang should minimize contact with others and could return to work in one week. Also on that day, Zhang prepared a WC-5 Employee's Claim for Workers' Compensation Benefits, describing her work injury as headache, fatigue, dizziness, failure to concentrate due to mental stress, subsequent insomnia, loss of appetite, and weight loss.

On July 5, 1994, DLNR personnel officer Melvin Young ("Young") reviewed Zhang's files to ascertain her employment eligibility status. Although Young later represented that this review was a part of a routine review to reverify the employment eligibility and work authorization of DLNR's alien employees, Young later admitted that only Zhang's records had been reviewed. Then on July 18, 1994, Young wrote to Zhang, stating that her employment authorization had only been granted until January 1, 1994, and asking that she contact the INS, to submit

---

[3] On July 8, 1997, this court held in Mitchell v. DOE, 85 Hawai'i 250, 942 P.2d 514 (1997), that a stress-related injury caused by a disciplinary action within the course of employment is compensable under workers' compensation law. Pursuant to Act 224 of 1998, the Legislature added HRS § 386-3(c), generally excluding mental stress resulting solely from good faith disciplinary actions from the workers' compensation scheme. 1998 Haw. Sess. Laws Act 224, § 2 at 768.

documents showing extension of her visa and employment authorization by July 25, 1994. Also on that date, Higa prepared a job evaluation report for Zhang for the three month period of April through June 1994, finding her "Not quite satisfactory" for "Quantity of Work on the Job" and "Work Attitudes on the Job."

At a July 22, 1994 meeting with Young, Zhang therefore submitted (1) a copy of a December 15, 1993 letter from Zhang to the INS inquiring of the status of her Form I-485 for adjustment to permanent resident status, and (2) a January 18, 1994 response from the INS indicating that her application was still pending. Zhang followed up on the July 22, 1994 meeting with a letter that day, stating that her documents showed there were no problems regarding her work authorization, asking that Young not contact the INS directly regarding her status, expressing her opinion that Young's July 18, 1994 letter was a continuation of harassment, and asking that any further inquiries be memorialized in case her explanation and documentation had not been sufficient.

Young responded via letter dated July 25, 1994, asserting that none of Zhang's documents provided the required information or related to an approval of her work authorization beyond January 1, 1994, and informing Zhang that she would be

11

terminated if the requested documentation was not received by July 27, 1994.

According to Zhang, on July 25, 1994 at 4:45 p.m., she was planning to work late when Higa told her she needed to leave at 5:00 p.m.  When asked why, he allegedly said his supervisor, Eric Hirano, told him to tell her to leave at 5:00 p.m., otherwise he would give her a reprimand.  When she asked why only she needed to leave, Higa allegedly went to Hirano's office, then returned at 4:57 p.m. and said that everyone must leave at 5:00 p.m.

Zhang returned to Dr. Mirikitani on July 26, 1994, noting that she had been working since July 11, but had an argument with her supervisor the day before, had been criticized for working late, felt discriminated against, had not been able to sleep the night before, and had called in sick that day.  She stated she was having difficulty doing work when harassed, and was worried about paying for her medical expenses.  Dr. Mirikitani diagnosed major depression, noting a "no win situation for pt."  She counselled Zhang to settle her grievances.  Zhang responded that she was taking steps to do so, but that the process would take time, and expressed an honest desire to work.  On that day, Dr. Mirikitani prepared a certificate to return to work noting that Zhang "is able to return to work on 8/1/94."

12

Also on July 26, 1994, a hearing took place in Loui's office attended by Loui, Hirano, and then-HGEA Field Services Officer Randy Perreira ("Perreira") regarding the step 1 grievance HGEA had filed on behalf of Zhang with respect to Loui's June 30, 1994 letter.  During that hearing, Perreira apparently asserted that the June 30, 1994 letter had been improperly placed in Zhang's personnel file in violation of Article 16 of the CBA.[4]

Also on July 26, 1994, Zhang wrote to Young, submitting additional "documentation required according to the INS rules that verify [Zhang's] work and immigration status."  Zhang explained that an INS agent Paul Fereza ("Fereza") indicated to her that her check written with her application for extension of her work authorization qualifies as a receipt, and therefore is sufficient until authorization is received.

Despite this, Zhang, Hirano, and possibly also Young went to the INS office on this or the next date to clarify Zhang's work authorization status.  It appears that DLNR was focused on

---

[4]     During the hearing, Loui stated that the letter was only a "courtesy reminder," and was not placed in Zhang's file, and Hirano confirmed this statement.  Given these assurances and a confirming letter from Loui to HGEA dated July 27, 1994, which also stated that the June 30, 1994 letter had been sent to provide Zhang with the same ninety day notice provided to regular employees facing a pending reduction in force or layoff, this charge was not pressed further.  When Zhang reviewed her personnel file after her termination, however, Loui's June 30, 1994 "courtesy reminder" letter was in her personnel file.

the H-1B it had prepared in May 1993, which apparently had never been submitted. In a July 28, 1994 memorandum to INS agent Fereza, Hirano explained that DLNR had no additional information on Zhang's H-1B petition for a non-immigrant visa. A notation on that memorandum indicates that Ferreza called back to say that the INS was also unable to find any records on an H-1B petition for Zhang. Young then wrote to Zhang later that day, stating that DLNR's review of the documents submitted showed that Zhang still did not have proper INS employment authorization after January 1, 1994, and that she was terminated effective close of business on July 27, 1994 "as stipulated in our memorandum to you dated July 25, 1994." Thus, July 27, 1994 was Zhang's last day of work at DLNR.

On August 2, 1994, HGEA wrote to DLNR Chair Ahue, expressing dissatisfaction with the handling of the first step grievance it had filed on behalf of Zhang. According to this letter, Zhang had been notified by letter dated June 30, 1994 that her employment would be terminated September 30, 1994. HGEA alleged that DLNR's decision to not renew Zhang's employment was in retaliation for Zhang having filed grievances against DLNR, and was the culmination of a pattern of harassment. HGEA demanded her reinstatement.

On August 4, 1994, Zhang wrote to the State of Hawai'i Department of Human Resources Development, State Workers' Compensation Division, requesting

> an immediate hearing regarding the denial of my workers'
> compensation benefits by Melvin Young, Personnel Office,
> Dept. of Land and Natural Resources. The HGEA supports my
> contention that Rae Loui, Deputy Director of DLNR and other
> management personnel have cohorted [sic] to put extreme
> pressure on me at my work. Since my original WC claim, the
> harassment and discrimination has [sic] escalated, to the
> point of Melvin Young terminating me on July 27, 1994.
> This termination is illegal according to Federal Law, and
> will be investigated by the Office of Special Counsel (OSC)
> Dept. of Justice in Washington, D.C. which investigates
> National Origin discrimination cases, the Hawaii Equal
> Employment Opportunity Commission (EEOC), the Hawaii Civil
> Rights Commission and HGEA Union #13.

Zhang further alleged that "Rae Loui, Melvin Young, Eric Hirano, and David Higa of DLNR have caused [her] extreme stress and although [she] tried to work through it, it just became unbearable . . . ."

Zhang saw Dr. Mirikitani again on August 5, 1994. Despite the initial denial of compensability, Dr. Mirikitani continued to treat Zhang's depression as work-related.

On August 10, 1994, Zhang wrote to Young, enclosing a photocopy of a Department of Justice Employment Authorization Card issued on that date. Zhang requested immediate reinstatement, but was not reinstated.

After her termination, Zhang also sought treatment with psychologist Dr. Rosemarie Adam-Terem ("Dr. Adam-Terem"), who she first saw on August 17, 1994. Dr. Adam-Terem diagnosed major depression and generalized anxiety disorder, and

15

recommended continued therapy.  Thereafter, Zhang continued treatment with both Drs. Mirikitani and Adam-Terem.

**B.    1994 to 2006:  Preliminary Decisions of the Director and Circuit Court Complaint**

By decision dated December 15, 1994, the Director of the Department of Labor and Industrial Relations ("Director") determined that Zhang suffered a compensable work-related stress injury.  By supplemental decision dated April 28, 1995, the Director awarded Zhang temporary total disability benefits from June 25, 1994.

In the meantime, on August 5, 1994, Zhang had filed charges of employment discrimination with the U.S. Equal Employment Opportunity Commission and the Hawai'i Civil Rights Commission.  On August 31, DLNR responded to the Department of Justice, asserting that Zhang had not been discriminated against, and that the sole reason for her termination was her alleged failure to provide necessary work authorization documentation.

A complaint was then filed on Zhang's behalf on July 26, 1996 in the Circuit Court of the First Circuit ("circuit court"), Civil No. 96-3117-07, alleging ancestry and national origin discrimination and retaliation.  A bench trial took place before the circuit court in June 1998.  The circuit court's July 23, 1998 Findings of Fact, Conclusions of Law and Order and August 14, 1998 Judgment ("Judgment"), concluded that Zhang's

16

termination was not based on ancestry or national origin discrimination and retaliation, and was also not based on retaliation for the filing of grievances. The Judgment was not appealed.

The circuit court entered the following findings of fact directly relevant to this appeal:

1.    That [Zhang] is a Chinese National who was allowed to enter and work within the State of Hawaii pursuant to an "executive order" "work exemption" which was to expire in January of 1994.

2.    That [Zhang] was hired by the State of Hawaii in June of 1992. [Zhang] was hired as a civil engineer by the [DLNR] on a temporary basis, renewable on a yearly basis.

3.    That [Zhang] recognized her temporary work status within the State of Hawaii, and as such, she sought to extend or eliminate this temporary status by various means.

4.    That one means of extending or eliminating this temporary work status was by way of an H-1B petition. The petition required sponsorship and [Zhang] sought sponsorship from [DLNR].

5.    That as a result of [Zhang's] request for sponsorship, [] Loui had questions and concerns as to some of the inquiries contained within the H-1B petition. As such, [] Loui memorialized her questions and concerns in Exhibit 9. The questions and concerns contained within Exhibit 9 were not generated as a result of [] Loui's meeting with the FBI or as a means of finding a "legal way to discriminate" against [Zhang] "on the basis of national origin".

6.    That the expiration of [Zhang's] work status was noted by [] Hirano a few months after the expiration date. [] Hirano notified [] Young of this expiration.

7.    That it was [] Hirano and Young's impression that sanctions could be imposed for their failure to note the expiration of [Zhang's] work authorization in a timely fashion. As such, [Hirano and Young] sought to remedy the matter by seeking, what they believed to be, the necessary documents from [Zhang].

17

8.  That [Zhang] submitted, what she thought to be, the necessary documents to [] Young. [ ]

9.  That it was [] Young's position that [Zhang] did not submit the documents which were necessary for the extension of her work authorization.  As such, [Zhang] was terminated from her employment with [DLNR].

. . . .

13.  That there is no credible evidence to support a finding that [Zhang's] termination from employment [] was based upon her "national origin". [sic]

. . . .

18.  That [Zhang] did file "grievances" against [] Louie for some of the "acts" [Zhang] was required to do.  The record does not support a finding that [Zhang's] termination was a result of the filing of these grievances.

19.  That [Zhang] did file charges of "discrimination" . . . .  However, the timing of the filing of these charges and termination of [Zhang] does not support a finding that [Zhang's] termination was based upon retaliation for the filing of "discrimination" charges.

20.  That [Zhang] has failed to meet her burden in presenting the Court with credible evidence that provides a "link" between her termination and her allegations that it was based upon "national origin" and/or for "retaliatory" purposes.

DLNR continued to pay Zhang temporary total disability benefits and medical costs through 2003.  Zhang continued treatment for depression with Dr. Mirikitani through at least 1997, and with Dr. Adam-Terem through 2003.

Zhang underwent an independent medical examination ("IME") with DLNR's physician, Dr. John Stretzler ("Dr. Stretzler"), on August 1, 2002.  On August 8, 2002, Dr. Stretzler opined that Zhang did not have a mental disorder, and diagnosed her with a

18

pre-existing "Paranoid Personality Disorder with Narcissistic Traits."  Zhang requested vocational rehabilitation services on July 12, 2002, underwent testing, and prepared to enroll in classes at a local community college.  As of May 5, 2004, no vocational rehabilitation plan was formalized.

On August 15, 2002, Zhang was informed that, based upon Dr. Stretzler's findings, her temporary total disability benefits would terminate effective August 29, 2002.  By letter dated November 21, 2002, Zhang requested a hearing to review DLNR's "denial of services."  By second supplemental decision dated July 30, 2003, the Director determined that Zhang's compensable work injury "was limited to an Adjustment Disorder that resolved and Major Depression that is in remission[,]" and denied further psychological treatment because her need for treatment was not related to her work injury, but rather, was due to a pre-existing personality disorder.[5]

Zhang appealed the July 30, 2003 supplemental decision to the LIRAB, which, by stipulation of the parties, remanded the case for a determination of Zhang's entitlement to vocational rehabilitation services and temporary total disability benefits.

_____

[5]    In making these determinations, the Director credited the testimony and reports of Dr. Stretzler that Zhang's work injury had resolved and that her then-current psychological problems resulted from a pre-existing personality disorder, over those of Zhang's treating psychologist, Dr. Adam-Terem.

19

Following a hearing on May 5, 2004 on the remanded issues, the Director issued a third supplemental decision on July 2, 2004, denying vocational rehablitation and additional temporary total disability benefits based on the July 30, 2003 supplemental decision, which concluded that Zhang's work injury had resolved.

Zhang appealed the July 2, 2004 supplemental decision to the LIRAB, which granted Zhang's Motion for Temporary Remand on the HRS § 386-142 claim.  A hearing was held on February 1, 2006, and continued and completed on March 21, 2006.

By fourth supplemental decision dated July 6, 2006 (as amended on July 18, 2006), the Director determined that Zhang was terminated as a result of her immigration work status, and not solely due to her workers' compensation claim.

On July 23, 2006, Zhang, now pro se, appealed the July 6, 2006 supplemental decision (as amended July 18, 2006), and continued the appeal of issues from prior decisions previously appealed to the LIRAB.[6]  On August 24, 2010, Zhang filed a fraud

---

[6]    In total, Zhang appealed three of the four supplemental decisions to the LIRAB, including the Director's supplemental decisions dated July 30, 2003, July 2, 2004, and July 6, 2006 (as amended July 18, 2006).

complaint[7] under HRS § 386-89(b)[8] against the INS and DLNR,

arguing

> INS knowingly and intentionally and in cooperation with
> DLNR and Eric Hirano, Melvin Young, and DLNR Personnel
> office [sic], fabricated the "Warning Notice" based solely
> on a fraudulent I-9 Form "review"by [sic] INS, to
> intentionally mislead and misrepresent [Zhang's] work
> status in the U.S., and that INS and DLNR knew [Zhang] was
> terminated while she was authorized to work in the U.S.

Zhang contended that she entered the United States under

Executive Order 12711, and that the CSPA extended her work

authorization status beyond January 1, 1994 because she had an

I-485 petition pending.

## C.    Appeal to the LIRAB

The LIRAB held a hearing on December 1, 2010.  The issues

relevant to this appeal that were to be determined at the

hearing included:  (1) whether Zhang is entitled to temporary

total disability benefits after May 5, 2004, and (2) whether

---

[7]      In its SDO, the ICA ruled that "the issue of Zhang's August 24, 2010 fraud complaint is not properly before us, and the LIRAB did not err by failing to find that DLNR committed fraud against Zhang" where "it does not appear that the Director made any ruling on the issue . . . [nor] that LIRAB was asked to remand the matter to the Director or otherwise take any action on Zhang's fraud complaint."  We likewise decline to address this issue for the first time on appeal.  See Kalapodes v. E.E. Black, Ltd., 66 Haw. 561, 565, 669 P.2d 635, 637 (1983) ("This court will not consider issues for the first time which were not presented to the [LIRAB].");  see also HRS § 386-87(c) (explaining the LIRAB's powers of review).

[8]      HRS § 386-89(b) (1993) provides, "[t]he director may at any time, either of the director's own motion or upon the application of any party, reopen any case on the ground that fraud has been practiced on the director or on any party and render such decision as is proper under the circumstances."

21

Zhang was terminated solely due to her filing of a worker's compensation claim, in violation of HRS § 386-142.[9]

The LIRAB issued its Decision and Order on December 6, 2011, reversing in part, modifying in part, and affirming in part the Director's supplemental decisions dated July 30, 2003, July 2, 2004, and July 6, 2006 (amended on July 18, 2006).  The LIRAB concluded that Zhang's "work injury includes major depression, in remission, and adjustment disorder, resolved, but not dysthymia."  The LIRAB also entered the following findings of fact:

<u>VR</u>

44. [Zhang] initiated vocational rehabilitation . . . on July 12, 2002.

45. There are no opinions that Claimant did not and may not suffer permanent partial disability as a result of the June 20, 1994 work injury.

46. The Board finds, therefore, that [Zhang] is entitled to further VR services.

<u>TTD</u>

47. There are no medical certifications that [Zhang] was temporarily and totally disabled as a result of the June 20, 1994 work injury for the period after May 5, 2004.

48. The Board finds, therefore, no evidence that [Zhang] was temporarily and totally disabled after May 5, 2004.

49. The Board makes no determination on [Zhang]'s entitlement to TTD after September 18, 2009 (medical

---

[9]    By pretrial order dated February 19, 2009, the issues to be determined were, <u>inter alia</u>:  (1) whether Zhang's work injury includes major depression, dysthymia, and/or adjustment disorder; (2) whether Zhang is entitled to further medical treatment; (3) whether Zhang is entitled to further VR services; (4) whether Zhang is entitled to TTD benefits after May 5, 2004; (5) whether to remand permanent partial disability for a later determination; and (6) the HRS § 386-142 claim.

reports deadline) or [Zhang]'s entitlement to TTD pursuant to Section 386-25, HRS, given the approval of future VR in the previous section.

. . . .

### Termination

57. The Board finds that the issue of whether [Zhang]'s termination from employment was solely the result of her industrial injury of June 20, 1994 has not been previously adjudicated.

58. The Board finds that [Zhang]'s termination from employment was not solely the result of her industrial injury of June 20, 1994.

The LIRAB also made the following conclusions of law:

3. The Board concludes that [Zhang] is entitled to further vocational rehabilitation services.

4. The Board concludes that [Zhang] was not entitled to temporary total disability benefits after May 5, 2004 for lack of disability certification. The Board makes no determination of [Zhang]'s entitlement to TTD benefits after September 18, 2009, as TTD may be related to re-enrollment in VR.

. . . .

7. The Board concludes, considering Section 386-142, Hawaii Revised Statutes, that [Zhang]'s termination from employment was not solely the result of her industrial injury of June 20, 1994. There is no evidence to support this contention.

## D.    Appeal to the ICA

Zhang, appearing pro se, argued, inter alia,[10] that the

LIRAB erred in (1) denying her temporary total disability

----

[10]    The first eight points of error concern alleged LIRAB error. Zhang argued that the LIRAB erred (1) by failing to find that DLNR committed fraud against Zhang; (2) by denying Zhang TTD payments, medical benefits, and "other benefits" after May 5, 2004; (3) by crediting the opinion of Dr. Streltzer and by determining that DLNR presented substantial evidence to overcome the presumption of work-relatedness regarding dysthymia; (4) regarding its permanent partial disability benefits decision; (5) by denying Zhang's request for a change in her workers' compensation "average weekly wage;" (6) by determining that DLNR did not violate HRS § 386-142; (7) by denying Zhang "full discovery" regarding her termination; and (8) by failing to recognize Zhang's entitlement to vacation and sick leave credits, as well

(continued. . .)

payments, medical benefits, and "other benefits" after May 5, 2004 based on its finding that there were "no medical treatment plans after May 5, 2004[,]" and noted an August 9, 2005 Workers' Compensation Treatment Plan written by Dr. Adam-Terem as an example; and (2) finding no HRS § 386-142 violation where she was terminated after the date of her injury and the filing of her workers' compensation claim.

DLNR argued, inter alia, that none of the medical reports after May 5, 2004 properly certified that Zhang's work-injury totally disabled her from work, and that HRS § 386-142 does not apply because Zhang "was terminated due to her failure to provide requested documents required by the INS and not because of her work injury."  As to the second issue, DLNR argued that Zhang failed to provide any evidence to establish that DLNR discharged her solely because of her work injury, instead providing evidence to show that DLNR should not have terminated her due to her immigration status.

The ICA affirmed the LIRAB's denial of temporary total disability after May 5, 2004 for lack of disability certification, ruling that the three medical reports dated after May 5, 2004 were insufficient under HRS 386-96, which mandates

_____

(. . .continued)
as her rights and benefits as a member of the HGEA.  In Zhang's ninth point of error, she argued that the award of attorney's fees to her attorney should not be included in the ICA appeal.  These points of alleged error are not pursued on certiorari and are therefore not addressed.

the submission of medical reports for the giving of treatment or rendering of services to an injured employee.  Based on the lack of adequate disability certification after May 5, 2004 and the LIRAB's deference on mixed questions of law and fact, the ICA concluded that the LIRAB's findings of fact 47 and 48 were supported by substantial evidence, and thus, the LIRAB did not clearly err regarding its temporary total disability decision in conclusion of law 4.

The ICA also rejected the HRS § 386-142 claim as being "without merit," stating, Zhang "provide[d] no further argument, facts, or authority supporting her assertion that the LIRAB erred, instead asking this 'Court to spell out ANY evidence of any action to terminate Zhang or to question her work authorization initiated PRIOR to June 20, 1994.'"

### III. Standards of Review

> Appellate review of a LIRAB decision is governed by HRS § 91-14(g) (1993), which states that:
>
>> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>>
>> (1) In violation of constitutional or statutory provisions; or
>> (2) In excess of the statutory authority or jurisdiction of the agency; or
>> (3) Made upon unlawful procedure; or
>> (4) Affected by other error of law; or
>> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

25

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

We have previously stated:

[Findings of Fact] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.

[Conclusions of Law] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.

A [Conclusion of Law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. The court should not substitute its own judgment for that of the agency.

Igawa v. Koa House Rest., 97 Hawai'i 402, 405-06, 38 P.3d 570, 573-74 (2001) (internal quotation marks, citations, and brackets in original omitted) (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)).

An FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

94 Hawai'i at 119, 9 P.3d at 431 (internal quotation marks and citations omitted).

### IV.   Discussion

Represented by counsel on certiorari,[11] Zhang asserts that the LIRAB erred in determining that (1) she is not entitled to retroactive temporary total disability benefits from May 5, 2004 to the present due to deficiencies in her physicians' successive certifications of disability, and (2) she was not terminated solely due to her filing of a workers' compensation claim, in violation of HRS § 386-142.  We address these issues as follows.

**A.   The LIRAB erred in denying Zhang's TTD benefits after May 5, 2004 based on deficiencies in the certifications of disability submitted by Zhang's physician**

Zhang received temporary total disability benefits totaling $226,869.84 for the period of June 25, 1994 to May 5, 2004, but was denied additional benefits from May 5, 2004 to September 18, 2009 (medical reports deadline).  To briefly summarize the proceedings relevant to this issue, the Director denied temporary total disability after May 5, 2004 on the basis that the July 30, 2003 second supplemental decision determined that Zhang's compensable work injury "was limited to an Adjustment Disorder that resolved and Major Depression that is in remission."  On appeal, the LIRAB affirmed the denial "for lack of disability certification."  The ICA affirmed the LIRAB on the same basis.

---

[11]    We sadly note the passing of Zhang's certiorari counsel, Lila Barbara Kanae, on March 19, 2016.

Zhang argues, inter alia, that the ICA erred in assuming "that successive medical certification was required to obtain TTD[.]"

The issue of the denial of temporary total disability benefits due to deficiencies in physicians' certifications of disability was specifically addressed by this court in Panoke, 136 Hawai'i 448, 363 P.3d 296, in which this court vacated the LIRAB's limitation of temporary total disability benefits, holding that "the LIRAB may not deny a claimant benefits based on deficiencies in a physicians' certifications of disability." 136 Hawai'i at 465, 363 P.3d at 313.  Rather, the consequence of a physician's failure to include required information, such as "dates of disability," in a report as required by HRS § 386-96 is a denial of compensation to the physician, not denial of the employee's claim for temporary total disability benefits.  Id. "To be sure, the LIRAB must assess the quality of the evidence that is presented, to determine whether the necessary showing has been made.  However, in doing so it cannot rely on the physician's failure to comply with the certification requirements set forth in those provisions."  136 Haw. at 466, 363 P.3d at 314.

In this case, the only allegedly valid disability certification dated after May 5, 2004 is the August 9, 2005 Workers' Compensation Treatment Plan by Dr. Adam-Terem, Zhang's

28

treating psychologist. The ICA ruled that this report "did not comport with the HRS § 386-96(a)(2) requirement that it include the 'dates of disability' because it simply constituted a plan for future treatment and did not specify any range of time the document was supposed to cover." DLNR asserts that this report is not a proper disability certification because it includes conditions for which DLNR is not responsible, and "Dr. Adam-Terem made no attempt to separate out what specifically caused [Zhang]'s inability to work."

HRS § 386-31(b) establishes an employee's entitlement to temporary total disability, and provides that when "a work injury causes total disability not determined to be permanent in character, the employer, for the duration of the disability, but not including the first three calendar days thereof, shall pay the injured employee" the prescribed benefits. HRS § 386-31(b) (emphasis added). Based on Panoke, the ICA and the LIRAB clearly erred as a matter of law in denying Zhang's temporary total disability benefits after May 5, 2004 based on deficiencies in the certifications of disability submitted by her physician.

Accordingly, we vacate in part the ICA's October 24, 2014 Judgment on Appeal and the LIRAB's December 6, 2011 Decision and Order as to the denial of temporary total disability benefits after May 5, 2004 due to alleged deficiencies in the

certifications of disability provided by Zhang's physician, and remand the issue to the LIRAB for further proceedings consistent with this opinion.  We decline to address Zhang's entitlement to temporary total disability on the other bases referenced in the LIRAB's finding of fact 49, such as temporary total disability after September 18, 2009 (medical reports deadline) or pursuant to HRS § 386-25 in light of Zhang's entitlement to future vocational rehabilitation services, as the LIRAB made no determination on those issues; thus, they are not properly before us.  See Kalapodes, 66 Haw. at 565, 669 P.2d at 637 ("This court will not consider issues for the first time which were not presented to the [LIRAB].");  see also HRS § 386-87(c) (explaining the LIRAB's powers of review).

**B.   Although Zhang appears to have been authorized to work, the LIRAB did not err in determining that Zhang's termination for alleged lack of work authorization did not violate HRS § 386-142**

At the outset, we address Zhang's contention that she provided sufficient documentation to establish her employment eligibility.  Based on the record and the law, it appears Zhang is correct.  We do not and need not decide this issue, however, because we conclude that Zhang's HRS § 386-142 claim is precluded by res judicata principles.

We do note that Zhang entered the United States in 1990 as the spouse of a Chinese student permitted to work pursuant to

30

Executive Order 12711, which granted Chinese nationals who were in the United States after June 5, 1989 employment authorization through January 1, 1994. See Exec. Order No. 12711 § 3, 55 Fed. Reg. 13897 (April 11, 1990). Executive Order 12711 was superseded by the passage of the CSPA in 1992. CSPA, Pub. L. No. 102-404, 106 Stat. 1969. The CSPA allowed Chinese nationals in the United States subject to Executive Order 12711 to apply for an adjustment to legal permanent resident status. CSPA § 2(a)(1) provided that upon application for adjustment of status, the Chinese national would be "deemed approved[.]" CSPA, Pub. L. No. 102-404, § 2, 106 Stat. at 1969. Thus, Zhang was permitted to apply for an adjustment to legal permanent resident status following passage of the CSPA in 1992.

Zhang submitted her Form I-485 to the INS on June 30, 1993. At the time of her termination, Zhang's application was still pending with the INS. As Zhang had submitted her Form I-485 with the required payment, it appears she was therefore deemed approved pursuant to CSPA § 2(a)(1), as confirmed by the August 10, 1994, Department of Justice Employment Authorization Card Zhang received and forwarded to DLNR. It appears she therefore did not need to file for an H-1B petition. As noted in the circuit court's findings, DLNR had drafted an H-1B temporary foreign professional visa application based on Zhang's request, but it appears it was never submitted. As also noted in the

31

circuit court's findings, unfortunately, DLNR apparently believed that the H-1B petition was pending and that Zhang needed to establish approval of the H-1B petition in order to establish work authorization after January 1, 1994.  Based on the July 28, 1994 letter from Hirano to the INS and other letters from Young noting that Zhang had not provided the appropriate documents, it appears that, at the time of Zhang's termination, DLNR did not focus on the effect of Zhang's pending Form I-485 application for adjustment of status within the context of Executive Order 12711 and the CSPA.  Based on the issuance of Zhang's Employment Authorization Card on August 10, 1994, it appears, however, that pursuant to the CSPA, Zhang was authorized to work in the United States at the time of her July 27, 1994 termination.  We need not, however, and do not decide this issue because res judicata principles, in any event, preclude Zhang's HRS § 386-142 claim.

With respect to the alleged HRS § 386-142 violation, Zhang asserts that "the sole issue for decision was whether the immigration/work status issue was not a ruse or cover" for her termination, and notes that the immigration issues emerged only after the filing of her workers' compensation claim.  DLNR's position is that Zhang "was terminated due to her failure to provide requested documents required by the INS and not because of her work injury."

DLNR also correctly asserts that Zhang is barred from raising an HRS § 386-142 claim under res judicata (claim preclusion) and/or collateral estoppel (issue preclusion), based upon the circuit court's decision in Zhang's employment discrimination lawsuit against DLNR, which was noted in LIRAB's finding of fact 32.[12]

As noted, the circuit court specifically found that Zhang had been terminated from her employment because of Young's belief that Zhang had failed to submit the documents which were necessary for the extension of her work authorization.  In other

_____

[12] Finding of Fact 32 in the LIRAB Decision and Order states:

> 32.  On July 23, 1998, Judge James P. Aiona, Jr.[,] issued Findings of Fact, Conclusions of Law and Order following a jury-waived trial.  In relevant part, Judge Aiona concluded that [Zhang's] termination was not based upon her "national origin" and that there were no changes in her employment in retaliation for filing any employment grievances and/or discriminatory complaints.
>
> The following were among Judge Aiona's Findings of Fact:
>
> . . . .
>
> 7.  That it was [] Hirano and Young's [sic] impression that sanctions could be imposed for their failure to note the expiration of [Zhang's] work authorization in a timely fashion.  As such, [Hirano and Young] sought to remedy the matter by seeking, what they believed to be, the necessary documents from [Zhang].
>
> 8.  That [Zhang] submitted, what she thought to be, the necessary documents to [] Young. . . .
>
> 9.  That it was [] Young's position that [Zhang] did not submit the documents which were necessary for the extension of her work authorization.  As such, [Zhang] was terminated from her employment with [DLNR].

words, the circuit court found this to be the reason for Zhang's termination. The Judgment incorporating this finding was not appealed. Pursuant to HRS § 386-73 (1993),[13] the Director has original jurisdiction over HRS § 386-142 claims, and the circuit court did not address this statute. The circuit court, however, found another cause for Zhang's termination, namely, Young's incorrect but actual belief that Zhang had failed to submit documents necessary for the extension of her work authorization. Therefore, Zhang is collaterally estopped from claiming that she was discharged "solely" because she filed this workers' compensation claim. The circuit court's specific finding as to the reason for Zhang's discharge has preclusive effect. Bremer v. Weeks, 104 Hawai'i 43, 53-54, 85 P.3d 150, 160-61 (2004) (noting that res judicata and collateral estoppel, respectively, apply when a claim or issue decided in the original suit is identical to one presented in the action in question). The issue of the reason for Zhang's discharge was addressed in her

---

[13] As it stated at the relevant time, HRS § 386-73 provided:

**§ 386-73 Original jurisdiction over controversies.** Unless otherwise provided, the director of labor and industrial relations shall have original jurisdiction over all controversies and disputes arising under this chapter. The decisions of the director shall be enforceable by the circuit court as provided in section 386-91. There shall be a right of appeal from the decisions of the director to the appellate board and thence to the supreme court subject to chapter 602 as provided in sections 386-87 and 386-88, but in no case shall an appeal operate as a supersedeas or stay unless the appellate board or the supreme court so orders.

circuit court lawsuit. The circuit court found a reason other than her filing of a workers' compensation claim. This finding has collateral estoppel effect, precluding Zhang from asserting that her filing of a workers' compensation claim was the "sole" reason for her termination.[14]

Even if res judicata principles did not govern, the LIRAB also concluded that Zhang's termination was not solely the result of her June 20, 1994 work-related injury based on a lack of evidence. The LIRAB's conclusion was not clearly erroneous.

### V. Conclusion

Based on the foregoing, the LIRAB clearly erred in denying Zhang's temporary total disability benefits after May 5, 2004

---

[14] It appears another aspect of res judicata not argued by DLNR could also preclude Zhang from now asserting that Young's belief as to the deficiency of her immigration documents was a mere ruse to retaliate against her for filing this workers' compensation claim:

> The rule against splitting a cause of action is an aspect of res judicata and precludes the splitting of a single cause of action or an entire claim either as to the theory of recovery or the specific relief demanded. The rationale for the rule is to prevent a multiplicity of suits and provide a limit to litigation. It exists to avoid harassment of the defendant, vexatious litigation, and the costs incident to successive suits on the same cause of action.

Bolte v. Aits, Inc., 60 Haw. 58, 60, 587 P.2d 810, 812 (1978).

The circuit court found that that Zhang had been terminated from her employment because of Young's belief that Zhang had failed to submit the documents which were necessary for the extension of her work authorization. Zhang could have asserted in the circuit court lawsuit that this belief was a "ruse." The rule against "splitting" could therefore also prohibit Zhang from making this claim in this workers' compensation proceeding. Because we rule on collateral estoppel principles, we do not address or decide this possible issue.

due to deficiencies in her physician's disability certification. We therefore vacate in part the ICA's October 24, 2014 Judgment on Appeal and the LIRAB's December 6, 2011 Decision and Order, and remand the case to the LIRAB for further proceedings consistent with this opinion.

DATED:  Honolulu, Hawai'i, August 8, 2016.

Juliana J. Zhang,
petitioner

James E. Halvorson
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ R. Mark Browning

